## Micheals *v.* Micheals, Appellant.

*Divorce—Master's findings of facts—Review by the court—Duty of appellate court.*

On an appeal from a decree of the Common Pleas sustaining an award of a master in divorce in favor of the libellant it is the duty of the appellate court to examine and carefully consider the evidence, and determine whether it satisfactorily establishes the facts which, under the express authority of the statutes, authorize the court to enter a decree.

464, (1917).]     Syllabus—Statement of Facts.

While it is the duty of the court to give consideration to the opinion of the master, particularly where the veracity of witnesses is involved, yet even on such a question the court must exercise its own judgment from an examination and consideration of the evidence, and is in no sense bound to adopt the finding of the master or treat it as casting the burden on the party excepting to his report.

*Divorce—Collusion—Credibility of libellant—Conflicting statements.*

Where a libellant, a husband, in a divorce suit swears to an affidavit that the suit was not brought through collusion between him and his wife, but in his testimony swears that he told his wife that he was going to bring the suit, and that she agreed not to defend it, such conflicting statements greatly impair the credibility of the libellant, relying on which, a master awarded a decree in his favor. Such conduct in itself is ground for dismissing the libel.

In examining the record in a divorce suit, where a master has recommended a decree in favor of the libellant based upon the credibility of the libellant, the court will consider of little weight in determining the question of credibility, a finding by the master that the respondent and her witness were directly contradicted by a disinterested witness, where it appears that the disinterested witness testified as to what occurred at one time while the respondent and her witness testified as to what occurred at other and different times, and that there was no contradiction at all between them.

A master's finding that a decree of divorce should be awarded in favor of a husband against his wife for desertion will not be sustained where the evidence shows that the libellant wronged the respondent when she was under sixteen years of age, was forced to marry her, that shortly afterwards he began to address her with brutal and offensive language, left her for a week, did not provide her food or money to purchase it, and forbade the members of her family to bring her food, with the result that the respondent left the libellant's house with her young child and returned to her mother's house.

Argued Oct. 5, 1916. Appeal, No. 393, Oct. T., 1915, by defendant, from decree of C. P. No. 5, Philadelphia Co., March T., 1915, No. 80, awarding divorce in case of Martin Luther Micheals v. Marguerite B. Micheals. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, KEPHART, TREXLER and WILLIAMS, JJ. Reversed.

Libel for divorce.

The facts are stated in the opinion of the Superior Court.

*Error assigned* was in entering a decree for divorce.

*William J. Lawson,* for appellant.

No printed brief for appellee.

OPINION BY PORTER, J., March 9, 1917:

The libel in this case averred that the respondent "did, on March 29, 1909, wilfully and maliciously and without any just or reasonable cause, desert the libellant and absented herself from their habitation during the space of two years and upwards, to wit: from March 29, 1909, to the date of the libel, without the consent of libellant." The respondent filed an answer denying the allegations of the libel. The court appointed a master who filed a report, with findings of fact and his conclusions of law thereon, recommending that the prayer of the libel be granted and a decree entered divorcing the parties from the bonds of matrimony. The exceptions to the report of the master were filed on behalf of the respondent, which exceptions the court overruled and entered a decree divorcing the parties, without filing an opinion stating the cause for its action. The respondent appeals from that decree.

The legislation of the State of Pennsylvania has not indicated an intention to make the obtaining of a divorce an easy matter. The opinion of a master is merely advisory to the court, which it may accept and act upon or disregard in whole or in part according to its own judgment as to the weight of the evidence or the legal conclusions of the master. It was not intended that the court should abrogate its own functions and delegate the discharge of its duty to its appointee. It is undoubtedly true that it is the duty of the court to give consideration

to the opinion of the master, particularly where the veracity of witnesses is involved. But even on such a question the court must exercise its own judgment from an examination and consideration of the evidence, and is in no sense bound to adopt the finding of the master or treat it as casting the burden on the party excepting to his report: Howe v. Howe, 16 Pa. Superior Ct. 193; Naylor v. Naylor, 59 Pa. Superior Ct. 547. Whether exceptions are filed to the report of the master or not, it is still the duty of the court to examine and carefully consider the evidence and determine whether it satis-factorily establishes the facts which, under the express authority of the statutes, authorize the court to enter a decree. These principles have been established by the decisions not merely as founded upon public policy alone but as based upon any reasonable construction of the statutes which confer jurisdiction upon the courts. The appellate court must in every case, except where the facts have been determined by a jury trial, apply these principles in disposing of cases of this character.

There was in this case a conflict of testimony as to some of the occurrences and conversations between these parties at and about the time of their separation. The question of the veracity of the witnesses, who testified as to those particular matters, was involved. The master states in his report that he disbelieved the testimony of the respondent and her brother, and gives his reasons for so doing. The following quotation from the report fairly states the grounds upon which the master based his conclusion that the testimony of the libellant must be accepted as true notwithstanding the fact that it was directly contradicted by two witnesses. "Libellant is a carpenter. He did not appear very alert or ready but a certain dull consistency in his testimony is very much in his favor. The testimony of the respondent and her family presents a different aspect. The respondent is bright, quick and intensely bitter against her husband. The story related by her and her brother as to their call

at libellant's for the furniture is directly contradicted by a wholly disinterested witness named Korte, who accompanied the brother on the wagon.    Their description of this event is so brazenly false that it destroys confidence in the rest of their evidence.    Moreover, the surrounding circumstances and general course of human conduct is opposed to their version of the separation and the events leading up to it."    The reasons thus stated may be fairly summarized as follows:  (1) The appearance of the libellant and the manner in which he testified favorably impressed the master.    (2) The story related by respondent and her brother as to the call at libellant's for the furniture is directly contradicted by a wholly disinterested witness named Korte, and for that reason the master believed their testimony to be brazenly false and had no confidence in the rest of their evidence.    (3) The surrounding circumstances and general course of human conduct is opposed to their version of the separation and events leading up thereto.    We will consider these three reasons separately, and as the third had precedence in time we will first discuss it.

Circumstantial evidence is no doubt of great value in many cases, assisting in the ascertainment of the truth. It is proper to inquire what would be the "general course of human conduct," or what a reasonable man would do, under given circumstances.    But in order that such evidence may be given proper weight it is necessary to consider all the circumstances under which the parties acted.    What were the circumstances under which these parties had married and lived together?    In the year 1907 this libellant was a young man in his twentieth year and he debauched this respondent, who was then a school girl fifteen years of age.    She became pregnant and finally revealed her condition to her mother.    The mother went to the libellant and told him, without making any other comment, that the respondent wanted to see him. The libellant went to see the respondent and found her crying and she told him "I am in trouble and it is up to

you to get things straightened out before the whole neighborhood knows it.    We better get married as soon as possible."    The libellant consulted his father, with whom he was then living, and the latter advised him to marry the respondent at once.    They were married on March 11, 1908.    The respondent was at that time fifteen years and four months old and she was in the fourth month of pregnancy, this libellant being the father of the child. They went to live in the house with the father of the libellant, and there being no other woman in the house, the respondent did the housework, except during the time that she gave birth to the child in August, 1908.    After she recovered from the illness incident to the birth of her child she again did the housework.    This continued until the latter part of February, 1909, when libellant's father went to live with his daughter, thus leaving libellant and respondent and their child, as the only occupants of the house.    During all the time that the father of libellant lived with them there had been no quarrel between this libellant and the respondent.    The respondent testified that so long as libellant's father remained with them they had plenty to eat and got along very comfortably.    The father of libellant testified that while he was with them they got along "fine."    There had been no quarrel between the libellant and the respondent up to that time.    The libellant himself testified in this proceeding to all of the above stated facts, except that his testimony was evasive as to the age of his wife. The age of the wife was conclusively established by the public records of the City of Philadelphia and the testimony of witnesses.    Any jury would have been satisfied of those facts beyond any reasonable doubt.    It thus appears that this libellant had been guilty of statutory rape, a felony.    By marrying this school girl he closed the mouth of a witness whose testimony would have been essential to his conviction.    Now, in these circumstances would our observation of the "general course of human conduct" lead us to the conclusion that the girl would

be more anxious to cast off her husband and face the world alone than the husband would be to get rid of the wife whom he had married to avoid punishment?   Is there anything in these circumstances which would warrant us in assuming that the libellant was more worthy of belief than the respondent?   We are of opinion that there was not, and that particular reason for the master's conclusion is not well founded.

The second reason which led the master to disbelieve the testimony of the respondent and her brother, viz: that their testimony "as to their call at libellant's for the furniture is directly contradicted by a wholly disinterested witness named Korte, who accompanied the brother on the wagon," may now be considered.   Our knowledge of and respect for the learned master has led us to read, reread and carefully consider every word of the testimony and we are convinced that the master was misled by one of those tricks of the memory of which even the most careful men are sometimes the victims.   Korte testified only as to what had occurred at the time certain furniture, which libellant admitted was the property of his wife, was removed from the house in which the parties had lived together.   He said that he had accompanied the brother of respondent to the house in an express wagon, that the respondent was at the house, that the libellant was not present when they arrived but came there after they had removed certain furniture to the wagon, that nothing else was removed after the arrival of libellant, and that the brother of the respondent was in the wagon with him (the witness) all the time after the arrival of the libellant.   He also said that the libellant did not say anything to him, nor did he hear any conversation between the libellant and any other person, although it may be fairly inferred from his testimony that the libellant and respondent did have some conversation which he did not hear.   It may be fairly inferred from the testimony of this witness that the brother of the respondent did not at that time have any conversa-

tion with the libellant, and, also, that the brother could not have heard any conversation which passed between the libellant and the respondent.  This witness did not pretend to accurately fix the time with regard to which he was testifying, he would only say that it was in the spring of the year, five or six years ago.  He was asked by the master what kind of things were taken from the house at the time: "Q. Furniture or clothes, or what? A. Furniture."  This clearly indicates that it was furniture and not clothing that was at that time taken from the house.  It is very clear that the master thought that this testimony referred to the same occurrence with regard to which the respondent and her brother had testified, and if such had been the case the testimony would have been a flat contradiction of the respondent and her brother.  The difficulty with the proposition is that neither the respondent nor her brother had testified as to what occurred at the time the furniture was removed; their testimony related to what was said on entirely different occasions.  The brother did not testify as to anything that occurred at the time the furniture was removed and he was not asked a single question which had any reference to that occurrence.  The respondent, after having testified as to certain occurrences on the 28th and 29th days of March, 1909, on which last day she was ordered out of the house by the libellant, said that she went back on the first day of April to get clothes for the baby, that her husband was there and said "What the hell do you want?", she told him that she wanted some clothes and he said "Take everything that belongs to you because you can't come back to the house," and he went and helped her to get the clothes and bundled them up— "he couldn't get me out of the house fast enough."  This testimony was corroborated by that of her brother.  She subsequently gave this testimony: "Q. Your husband testified that on the first of April your brother and another young man came there and took the furniture from the house?  A. That is an untruth—he didn't move one

article from the house on that occasion—on another occasion he was, my own personal belongings that he took." This is the only reference in the entire testimony of the respondent to the removal of the furniture, her entire testimony, with regard to the manner in which she was treated by her husband, referred to occasions other than that of the removal of the furniture. The testimony of Korte may have been absolutely true, it certainly was not contradicted by any witness in the case, and yet it did not contradict one word of the testimony of the respondent or that of her brother. The conclusion that the testimony of the respondent and her brother, as to the vital fact that the libellant repeatedly ordered her out of the house, must be disregarded upon the ground that it was contradicted by the disinterested witness Korte, cannot be sustained, for the simple reason that Korte testified as to what occurred at one time while the respondent and her brother testified as to what occurred at other and different times.

This leaves to be considered the first reason which led the master to conclude that the testimony of the libellant was entitled to greater weight than that of the respondent and her brother, to wit: the appearance of the parties and the manner of their giving testimony. There can be no doubt that the appearance of witnesses upon the stand and their manner of giving testimony may have much to do with determining the weight to which that testimony is entitled; all other things being equal, those elements may sometimes properly turn the scale. It is proper also to consider the substance of the testimony given, the circumstances under which the witness testified, his interest in the subject-matter of the litigation, what he has done with regard thereto and all the conditions which surround him. The appearance of the parties must not lead us to wholly disregard those things which they have indisputably done. It is, therefore, necessary to consider this particular proposition in connection with the entire record and testimony in this case.

The law of Pennsylvania does not permit collusion between husband and wife for the purpose of obtaining a divorce, and so it is that it requires a libellant to make an affidavit that the complaint is not made out of levity, or by collusion between him and the respondent, for the mere purpose of being freed and separated from each other, but in sincerity and truth for the causes mentioned in the libel. This libellant complied with the law and filed, with his libel, the affidavit required. In the face of this express averment in his affidavit, the libellant when being interrogated by the master admitted that shortly before he made the affidavit and filed his libel he had gone to the store where the respondent was employed and made with her the following arrangement: "I said, 'I suppose you will never live with me again?' She says, 'No.' I said, 'I am thinking about getting a divorce; what do you think about it?' She says, 'I am satisfied for you to get it.' I said to her then if she would leave me go ahead and not interfere or anything it would only cost the counsel fee and something more, but if she did interfere I wouldn't be able to get it and I would drop it. She says, 'Go ahead with it, I won't interfere. Just so that people would not talk about the scandal, and that there would be nothing said about it, for women talk about everything,' she said. I says 'I will,' and I went on then." Now, if this testimony was true there was collusion between the parties and the libellant knew, when he filed the libel, that he had an arrangement with the respondent under the terms of which he was to proceed to procure a divorce and she would present no objection. The case thus presented was precisely similar to that of Latshaw v. Latshaw, 18 Pa. Superior Ct. 465, in which it was held that a decree of divorce should be refused and the libel dismissed on the ground that the proceeding was collusive. The learned master was of opinion, however, that the libel ought not to be dismissed upon that ground, for the reason that the respondent had not adhered to the agreement and the case had been contested.

It is true that the libellant did testify that he went to see the respondent after she had been served with the subpœna in divorce, and that she then told him she had concluded to contest the case. The respondent, it is true, testified that she had never entered into the collusive agreement and that no such conversation had taken place. If the respondent had offered no testimony whatever, and the case had been submitted on the testimony produced by the libellant, there can be no question that the libel ought to have been dismissed, upon the ground that the proceeding was collusive. Whether a proceeding for divorce which is tainted with collusion at its inception can be relieved of that taint by the subsequent action of the respondent, in making a real or feigned defense, is certainly subject to serious question. Speaking for myself, I do not think that it can, but we do not deem it necessary to decide that question in the present case. We cannot, however, ignore the fact that the libellant had sworn in his affidavit that there was no collusion between the parties and that in his testimony before the master he unblushingly testified that there was a collusive agreement. His purpose in so testifying manifestly was to induce the master and the court to believe that the respondent had persisted in an alleged wilful and malicious desertion down until the very time the libel was filed. The allegation in the affidavit which accompanied the libel and his testimony before the master were both relevant and material to the issue, and they were directly in conflict. This does not commend his testi- mony to our favorable consideration. Another incident connected with libellant's testimony is not satisfactory. The circumstances under which the respondent left the house where they had been living were disputed; the respondent asserted that the libellant had not been working during the month of March, 1909, and had not supplied her with sufficient food during the last two weeks of their cohabitation and that libellant had ordered her mother out of the house and refused to permit her or

other members of the family to carry food to her; the libellant denied this, said that he had only been out of work during the last week that they lived together and that shortly before they separated he had worked for the Fitler Cordage Company; that he gave his wages to the respondent and that there was plenty of food in the house. The question whether the libellant had been working and where he had been working at that particular time was, therefore, material. He gave the above testimony, as to working for the cordage company, on May 13, 1915, and after he had given it, counsel for respondent, asked him this question: "Q. As a matter of fact weren't you only working there two days? A. No, it was two weeks. I am pretty sure it was two weeks. I know it was." Counsel for respondent, perhaps incautiously, then said: "Understand that I can prove this by the reports and I want you to answer fully and carefully." Counsel for respondent did on the following day, May 14, 1915, write to the cordage company and that company, on May 18, 1915, replied to his letter stating that the libellant had not worked for that company during the month of March, 1909. It does not appear in the evidence whether this libellant knew that this letter of inquiry had been written and the reply received. It does, however, appear that at the next meeting before the master, on May 25, 1915, the libellant was recalled to the stand and corrected his testimony, with regard to having worked at Fitler's Cordage Works and admitted that he had not worked there at any time during the month of March, 1909: "Q. I mean in reference to working at Fitler's—I mean during March, 1909. A. I worked there two weeks—not in March. Q. But you testified at the last meeting that you worked there two weeks in March —that is wrong? A. Yes, sir." It subsequently appeared, from a letter offered in evidence by counsel for libellant, that the libellant had not worked at the Fitler Cordage Works at any time during the entire year 1909. These plain facts are, in our opinion, sufficient to dissi-

pate any favorable impression which might have been created by the personal appearance of the libellant.

Let us now consider the circumstances which led up to the separation of these parties. The father of the libellant testified that he, the libellant and the respondent lived together in harmony, from sometime in March, 1908, until he left them and went to live with his daughter, which must have been in February, 1909. There is not a scintilla of evidence that during all that time there had been any quarrel, or that the respondent did anything of which the libellant could complain. The respondent did the housework and, although very young, she seems to have kept the house well. The evidence leads us to the conclusion that so long as the libellant was under the direct influence of his father he was industrious and the respondent had no ground of complaint. The father paid the rent for the house and five dollars a week for his boarding, he seems to have been the head of the house. The trouble began soon after he left. Sometime about March 1, 1909, the libellant and the respondent visited at the house of respondent's father and mother and because it was raining they remained all night; the husband came down on that Sunday morning and asked his wife to get his breakfast ready, pulled out of her hand the paper which she was reading and started "cutting up with her and fooling," a younger brother of respondent made a jesting remark, and according to the testimony of the libellant the entire occurrence was in good humor upon the part of all. He had hold of his wife when her mother came into the house and said "Here, here, what's going on here?" and thereupon the respondent said "He's trying to choke me." The libellant testified that when his wife said this he "got mad about it, real hot headed," and he said: "I am going" and walked out. The respondent cried when the libellant left the house. The libellant went, not to the house where he and the respondent had been living, but to the house of his sister where his father was stay-

ing and he boarded at that house for a week.  He made no attempt to see his wife or child during that week and manifested no desire to ever see either of them again. At the end of a week the respondent went to the libellant, crying when she did so and they agreed to again live together.  The only testimony as to this separation and what the libellant did during its continuance is that of this libellant, and the above clearly and fairly states its entire import.  The respondent's mother merely inquired what was going on, the libellant did not pretend to say that she made any other remark; it clearly appears the libellant became unreasonably angry merely because his wife said, while he "had hold of her—cutting up and fooling with her": "He's trying to choke me." Because of these words, uttered during a seemingly good natured romp, the libellant left his wife and his subsequent conduct indicated an intention to separate from her permanently, and all of this we have out of his own mouth.

After this occurrence they lived together for three or four weeks, there is no evidence that they had any quarrels during that period, but there is a conflict of evidence as to whether their circumstances were prosperous.  The libellant testified that he was working during all but the last week of that time and that there was plenty in the house to eat.  The respondent testified that her husband was out of work during the entire month of March, 1909; that a grocer, named Early, from whom she had previously bought for cash, extended her credit and that she bought groceries until the 15th of March, when the bill amounted to $6.20; that she had no money and the libellant refused to pay the bill and the grocer refused further credit.  This bill was due on the 15th of March, 1909.  The libellant testified that he had been working and giving his wife his wages and that she had the money to pay the bill.  The libellant admitted in his testimony that he owed this bill to Mr. Early and that he never had paid it.  He admitted that he had told him he wouldn't

pay the bill.  The significant fact is, however, that the libellant did not assert that the respondent could have obtained further supplies, upon credit, after March 15, 1909.  The testimony of the respondent, as to the fact that her husband was not working during the month of March, is corroborated by that of her mother and brother, and in view of the testimony of the libellant as to his employment by the Fitler Cordage Co., hereinbefore referred to, we are inclined to believe the testimony of the respondent.  She testified that after the 15th of March they had no supplies in the house, that her husband went outside to get something to eat, and that she was dependent for her sustenance upon what was brought to her by her mother.  She was then suckling her baby, which was seven months old.  This was the condition of affairs when the events which resulted in the final separation occurred.

The first of those events occurred on March 28, 1909. The libellant testified that he went out that morning to look for work and that when he returned in the forenoon he found the respondent's mother there talking to his wife about how to do her washing and ironing and cooking, that he asked his wife if she couldn't do the washing and ironing herself and that she replied that she couldn't. He told her that she had done it before and he didn't know why she couldn't do it again and that his mother-in-law then said she would take the washing and have it done at her house.  The libellant then said "Everything in this house is going to stay here except you and you will have to get out."  He insisted upon the respondent's mother leaving the house and she did so.  Concerning the fact that he put his mother-in-law out of the house there is no controversy, but as to the circumstances which led up to that event there is a dispute.  The respondent and her mother testified that the mother was there because she had brought some breakfast for the respondent to eat, and that the mother then actually started to do the washing, because the respondent was

not then in condition to do hard work. While the mother was at the wash-tub the libellant came in and told her to "Get the hell out of here." The only conflict in the testimony is as to the language used and as to the errand which really brought respondent's mother into the house. We are of opinion that it is established by the weight of the evidence that this libellant was not supplying his wife with sufficient food and that she was at that time dependent upon what her mother brought her to eat. There is no evidence that on this occasion the respondent uttered a single word, she submissively permitted her mother to be turned out of the house, and remained with her husband. That same evening the father of the respondent called to inquire of the libellant why he had turned respondent's mother out of the house. There is a conflict of evidence as to what was said by the father of respondent but we do not deem it necessary to discuss that question as none of the testimony discloses that the respondent said a single word during the interview, and all the witnesses agree that she remained with her husband that night.

This brings us down to the final separation, on March 29, 1909. The libellant testified that he and his wife had passed the preceding night together in their house and had breakfast together in the morning, that after breakfast he went out to look for a job and when he came back again, about eleven o'clock, his wife was gone, taking the baby with her; and that he did not see her again until the first of April, when, having been away from the house, he returned and found respondent there and her brother and another young man with an express wagon removing the furniture that belonged to his wife; that he asked what they were doing and she told him she was giving him the April fool, that she was going to leave him; that he tried to persuade his wife to remain saying that they could get along together if other people didn't interfere; and that his wife refused to remain and they took the furniture and went away. The re-

spondent, on the other hand, testified, that her brother brought down her breakfast that morning because her mother had been forbidden to come over, and that the libellant thereupon said to her, the respondent, "You had better get the hell out, I am sick of the whole damned thing of married life"; and called her a "damn bitch," in the presence of her brother, and that she left because she was turned out. Her testimony as to this occurrence is corroborated by that of her brother. The respondent further testified that she went back to the house on the first day of April, to get some clothes for the baby, that the door was locked and she knocked, but the door was not opened and her brother then came along and when she knocked a second time the door was opened by the libellant, who thereupon said "What the hell do you want?"; that she told him she wanted some clothes and he said "Take everything that belongs to you because you can't come back to the house" and that he went and helped her to get the clothes and bundled them up and hurried her out of the house. The testimony of the respondent is here again corroborated by that of her brother. The respondent did then leave the house and has not since lived with the libellant.

The libellant testified that the reason the respondent gave for leaving him, at the time the furniture was removed, was that she wouldn't live with him unless her mother could visit the house. The conditions under which a wife would be justified in separating herself from her husband upon the mere ground that her mother was not permitted to visit at the house must be exceptional. We are not prepared to say that in a case where a husband failed to provide his wife with the necessaries of life and the only source from which she could receive necessary food was from her mother, that it would not be barbarous and cruel treatment to thus cut off the source of all supply, but we do not deem it necessary to discuss that question in the present case. The burden was upon this libellant to establish that his wife had

wilfully and maliciously deserted him and absented herself from his habitation, without reasonable cause. We are of opinion that the libellant failed to establish these necessary jurisdictional facts by the weight of the evidence. Mere separation is not desertion. If a wife withdraws from the habitation of her husband for a reason which would afford her ground for divorce, her action cannot be deemed either wilful or malicious. The evidence in this case indicates that from the time libellant's father ceased to reside with respondent and libellant, the libellant was anxious to be rid of his wife and adopted a course of conduct which he intended should result in her going back to her father and mother to reside. That was why he first deserted her and remained away a whole week, without any reasonable excuse. His whole course of conduct after they again began to live together was such as to render the condition of his wife intolerable, she had not sufficient food in the house and he sought to cut off the source of supply from the home of the respondent's father. But starvation is sometimes a slow process and the appellant seems to have become impatient as a result. Turning a wife out of doors produces immediate results. If the testimony of the respondent and her brother, as to the events of March 29 and April 1, 1909, is true, the libellant literally "turned his wife out of doors"; and her leaving was not a wilful and malicious desertion.

The decree of the court below is reversed, the libel is dismissed and it is ordered that the libellant pay the costs in this court and in the court below.