# Humphreys *v.* Humphreys, Appellant.

*Divorce—Desertion—Evidence—Insufficiency.*

In an action of divorce on, the ground of desertion the libel should be dismissed, where the evidence established that the libellant had left the respondent without reasonable cause, had refused to discuss with her the difficulties between them, and the testimony indicated an attempt on the part of the libellant to provoke a desertion by the respondent.

*Divorce procedure—Master.*

A master in divorce acts in an advisory capacity only. It was not intended that judicial functions should in any material degree be relinquished by conducting the proceedings before a master, or that weighty judicial responsibility should be evaded by shifting it over to a member of the bar. It still remains the duty of the court to exercise its own independent judgment as to the law and the facts, to state its reasons for overruling or sustaining exceptions to the report of the master, and in addition to review in writing the case on its merits.

Argued December 5, 1924. Appeal, No. 181, Oct. T., 1920, by respondent, from judgment of C. P. No. 2, Phila. Co., March T., 1918, No. 1147, in the case of Frank Robert Humphreys v. Martha Jane Humphreys. Before ORLADY, P. J., PORTER, HENDERSON, TREXLER, KELLER, LINN and GAWTHROP, JJ. Reversed.

Libel in divorce. Before BARRATT, P. J.

The facts are stated in the opinion of the Superior Court.

James Gay Gordon, Jr., Esq., as master, recommended that a divorce be granted.

On exceptions to the master's report the court dismissed the exceptions and granted a divorce. Respondent appealed.

*Error assigned* was the decree of the court.

*I. G. Gordon Forster,* of *Evans, Forster & Wernick,* for appellant.

*Emanuel Furth,* and with him *David Bortin* and *Jacob Singer,* for appellee.

OPINION BY PORTER, J., July 9, 1925:

The parties were married in 1896, and cohabited together as man and wife until 1914. The appellee charged in his libel that "Respondent wilfully and maliciously deserted, absented herself from the habitation of libellant, without a reasonable cause, for a period of upwards of two years last past, and such desertion persisted in from thence hitherto, in that, on June 1, 1914, libellant then living with his wife and family at Brockwayville, Jefferson County, Pennsylvania, removed to Eldred, McKean County, Pennsylvania, and established a home there and practiced his profession as a physician and thereafter, on or about June 25, 1914, libellant requested respondent to join him at Eldred aforesaid, and live with him as theretofore, and respondent absolutely refused to join libellant or live with him." The respondent filed an answer denying the allegations and specifically denying that she had deserted the libellant and demanded a jury trial. The court refused to award a jury trial and appointed a master, who after hearing the testimony, reported the same to court together with his opinion of the case, and recommended a decree of divorce be granted. Exceptions were filed to the report of the master, which the court overruled and entered a decree divorcing the parties. We have this appeal from that decree.

The opinion filed by the learned judge of the court below, after quoting from the opinion of Mr. Justice DEAN, in Middleton v. Middleton, 187 Pa. 615, in which the duties of the court, in divorce proceedings, are distinctly set forth, clearly indicates that the court below was of opinion that the nature of the duties to be performed by the judges had been modified by legislation since the case cited was decided. The concluding paragraph of the opinion filed in the court below was as fol-

lows: "Middleton v. Middleton, supra, was followed by the Act of March 10, 1899, P. L. 8, which defines the duties and powers of masters in divorce and authorizes the court to appoint a master who shall take testimony and return the same together with the report of the proceedings before him and his opinion of the case to the court. The settled practice seems to be under this act, that the master's findings of fact in cases of sharp conflict in the testimony will not ordinarily be reviewed further than to ascertain if there be adequate support in the proofs for his conclusion. In this particular at least his report will be treated as that of a master in equity or auditor." In this the learned judge erred. The Act of March 10, 1899, provided that in suits of divorce in any court of common pleas, "it shall and may be lawful for the court when the case is ready to be proceeded with, either upon answer not demanding a trial by jury or exparte, to appoint a master, who shall take the testimony and return the same, together with a report of the proceedings before him and his opinion of the case, to the court." We have repeatedly held that the report of the master, appointed under the provisions of this statute, is advisory only. It was not intended that judicial functions should in any material degree be relinquished by conducting the proceedings before a master in his office, or that weighty judicial responsibility should be evaded by shifting it over to a member of the bar. It still remains the duty of the court to exercise its own independent judgment, as to the law and the facts, to state its reasons for overruling or sustaining exceptions to the report of the master, and in addition to review in writing the case on its merits: Hirch v. Hirch, 70 Pa. Superior Ct. 584. It may be doubted whether under a strict construction of the Act of 1899 the court had authority to appoint a master in the present case, for the answer did demand a jury trial, but we do not deem it necessary, in view of the conclusion reached upon the merits, to now decide that question. It must be kept in

mind that prior to the Act of 1899, when the facts had been found by the court below, except where there had been an issue and jury trial, the Supreme Court had always held it incumbent on it to review the testimony, and adjudge whether it sustained the complaint of the libellant. This applied to findings of fact by the judge of the court below, who had heard the testimony. Mr. Justice DEAN, in his opinion in Middleton v. Middleton, supra, thus states the principle upon which the Supreme Court had acted: "It has not adopted, in such appeals, the rule generally applicable to proceedings before a master or an auditor, that a finding of fact will not be disturbed except for manifest error. In every case in which the appeal was from a decree not based on the finding of a jury......it has taken up, analyzed and reviewed the testimony, and in nearly every case, has embodied its views in an opinion filed." "Whether the marital contract shall be severed is the gravest of questions, not alone to the parties, but to the state, for the social structure rests upon it."

We have carefully considered the evidence in this case, in all its details, and are convinced that the learned master and the court below failed to give due weight to the fact that there was no desertion, by the respondent, from the habitation of the libellant. The libellant was, in point of fact, the first to desert. The parties were married in 1896 and had lived together happily until the fall of 1913. There was a conflict of testimony as to the manner in which the disagreements in October, 1913, began and as to the nature of the communications and conversations of the parties, but whatever it was it was patched up and, as the libellant testified, "blew over." They lived together and continued to cohabit as man and wife until February, 1914. The libellant is a physician and about the middle of February, 1914, the respondent asked him for some aspirin tablets, whether for the use of herself or her sister we do not deem material. The libellant finding that the aspirin bottle in

his medical case was empty went to his office for the purpose of filling the bottle, and the light not being good he, through a mistake, filled the bottle with bichloride of mercury tablets instead of those composed of aspirin. After his return to his home the respondent went to the medical case and taking some of the tablets from the aspirin bottle, swallowed one of them, soon afterwards becoming very ill.   After violent vomiting she seemed to be more comfortable and they retired for the night.   The next morning the libellant discovered his mistake and summoned the sister of the respondent, who is a trained nurse, her brother, who is a physician, and called in the assistance of other physicians.   The respondent continued very ill for a considerable period of time, but did not know until several weeks had passed and after the libellant had deserted his home that she had taken poison. The libellant testified that he was led to believe that the brothers and sisters of the respondent were of opinion that he had intentionally attempted to poison his wife, this belief being due to the fact that there was always some person else present when he visited his wife, who was then critically ill.   There was not a scintilla of competent evidence tending to establish that the respondent or any of her relatives at the time said anything to him or anybody else indicating that they thought he had intentionally poisoned his wife.   The libellant according to his own testimony, seemed to have listened to the idle gossip of his own brother.   He began taking his meals at the hotel and restaurants and was at the time sleeping in his office, which was across the street from his house. He testified that about this time the brother of the respondent and the husband of her sister called upon him and said they came to see what he was going to do, that he replied: "Well, I will tell you one thing I am not going to do.   I am not going to live over in that house among a bunch of people like you folks until my wife is well and you folks don't have to stay there.   I am going to stay out until the rest of you go.   Then I guess I can

get in"; that the brother of respondent then said: "That is just what we want you to do.  We want you to stay out and Martha (the respondent) don't want you ever to come back again.  She never wants to see your face again," and that he (libellant) then said: "If that is the way of it, of course, I won't bother her for a little while."  When this conversation occurred, according to libellant's testimony, he had already begun taking his meals at the hotel and restaurants, and, as he in the conversation testified "was not going to live over in that house."  This was in the latter part of March and the libellant did not go to see his wife again nor visit the house, although, as he testified, "I felt as bad as any man could because I thought the stuff would kill her."  There was not a scintilla of evidence tending to establish that the respondent had at the time authorized her brother to deliver any such message, or that she knew anything about the conversation.  Dr. Hutchison, the brother, and Mr. Chittester, the husband of her sister, positively testified that no such conversation had occurred.  Assuming, however, that the conversation did occur; the libellant left his wife and children when she was critically ill as a result of his mistake, which we assume to have been innocently made, without making any attempt to communicate with her, without disclosing to her any reason for his conduct, leaving her in the house which he owned and of which he was the absolute master and to which no person had any right to deny him access, and went to live with his brother, in the same small town.  Had the libellant gone to see his wife and ascertained from her that she had authorized her brother to speak for her, then there would have been ground for holding that this was a separation by mutual consent.  But he did nothing of this kind.  He ceased visiting his wife and family, for the alleged reason that her sister was there as a nurse and her brother was attending her as a physician; yet his own testimony clearly established that that sister had been installed as a

nurse and the brother called as a physician by himself, without having consulted his wife on the subject, she being then too ill to know what was being done. We are of opinion that the reason given by libellant for deserting his wife was totally lacking in merit. His desertion of the family home was without reasonable cause. "Separation is not to be tolerated for light causes, and all causes are light which the law does not recognize as ground for the dissolution of the marriage bond": Mendenhall v. Mendenhall, 12 Pa. Superior Ct. 290, and decisions there cited.

The alleged desertion of the respondent was attempted to be established by proof that after the libellant had left the home which had been the habitation of the parties for years, without disclosing to his wife his intention to do so, she failed to follow him to another town. It must be remembered that he claims no desertion by proof against his wife, until after he had broken up the family relation, under circumstances above indicated. There was no desertion from the habitation of the libellant by the respondent, and in this respect the case is very different from the cases cited to show that if a wife deserts the habitation of her husband, or the husband turns the wife out of doors, that such acts can only be justified by reasons that will entitle the party to a divorce. The libellant left without disclosing to his wife any reasonable cause for so doing. By first leaving his habitation, he gave his wife the opportunity of showing why he did it and why and wherefore she did not follow. She was not bound to follow him if she had good reason to believe that his movements were solely with a view to force her to desert his habitation, and thus make a case for him: Angier v. Angier, 63 Pa. 450. Having left his wife his first attempt to communicate with her was through a lawyer, in June, 1914, and his instructions to that lawyer were, according to his own testimony: "I wish you would see if she intends to live with me any more, and if she will go with me to some other town, and I want

you to see her about the property, to see if she would sign deeds, or see what part of the property she would want, how much she would want for her share of the property if I would sell it." The lawyer did visit the respondent and asked her to join her husband in the town of Eldred in McKean County, but the respondent said that the invitation to go to Eldred was merely to trump up a charge of desertion against her, and that she did not care, under then existing circumstances, to leave the home in which they lived and had brought up their children. The libellant testified that on July 1, 1914, he mailed a letter to respondent requesting her to join him at Eldred, to which letter he never received any reply. The respondent testified that she never received any such letter. The libellant, on September 29, 1915, again wrote to the respondent a letter in which he invited her to join him at Eldred. The respondent promptly answered this letter, which reply the libellant admitted he had received, but testified that this letter and all others which he had received from his wife had been lost. He testified that in the letter she had refused to again live with him. She testified that she had not refused to live with him, but that she said in her letter that she felt he owed it to her to come back and at least talk things over. The libellant subsequently wrote other letters to the respondent asking her to come to Eldred, to which she had replied refusing to come. She testified that in none of her letters had she refused to live with him again, but that in all of them she had asked him to come back to their home and talk things over. It is upon the strength of these letters that it is now insisted that the libellant is entitled to a divorce. The right of a husband to change his residence and the obligation of his wife to follow him to his new home is undoubted, but the fact that she did not go is not conclusive of the question of intention; there may be circumstances rebutting the presumption of an intention to maliciously desert which otherwise might arise where the wife refuses to follow the husband

to the new place of residence. The burden is on the libellant, in such a case as that here presented, to show that his wife refused without cause to change her residence. The libellant in July, 1916, promptly upon the expiration of two years after the alleged desertion by the respondent, instituted a proceeding for divorce in McKean County, which, after the taking of considerable testimony, was discontinued, and the libellant changed his residence to Philadelphia where, in March, 1918, he instituted the present action.

The respondent testified specifically that when her husband sent to the home for his clothes, on June 1, 1914, she sent their son Donald to him with a message requesting him to come and see her in their home. The son Donald was called as a witness, and his testimony certainly indicated that his feelings were not hostile to the libellant; he testified specifically that he had on this occasion taken his mother's message to the libellant and that the libellant had refused to go to the house and talk to his wife, the respondent, without stating any reason for such refusal. Donald also testified that he had frequently, on subsequent occasions, when the libellant was visiting Brockwayville, carried messages to him from his mother asking him to come to the house; that on some of these occasions he had assured the libellant that the only persons in the home were the respondent and her two young daughters, but that the libellant had always refused to go to the home and talk to his wife, without giving any reason whatever. The respondent testified that this libellant had, in September, 1913, begun talking to her about leaving home and getting a divorce and asking her to consent to such a divorce, telling her that he would leave if she would sign a paper agreeing to institute an action for divorce upon the ground of desertion. The son, Donald, testified, when interrogated by the master, that he had been present on one occasion when the libellant was talking to the respondent about a divorce and the respondent was en-

deavoring to persuade him to give up the idea. Now, although the libellant was called in rebuttal, as to other testimony produced by the respondent, he did not deny this testimony of Donald, either as to his having refused to go to the home and talk to the respondent, or as to his talking to the respondent about getting a divorce. This testimony was positively uncontradicted. We have here a husband who left his wife in the home where they were living with their four children, without any reasonable cause. When he sent to the home for his clothes he received a message from his wife asking him to come and talk to her and he refused to comply with that request, but shortly afterwards he sends a lawyer to her, with instructions to ask her if she will come to Eldred to live and ascertain what amount of money she would want for signing a deed for the sale of the home and other property. He subsequently repeatedly refused, when in the small town where the home was, to go to the house and talk to his wife when she sent messages by the son requesting him to do so, although assured that there was no person in the house but his wife and their little girls. He had discussed the subject of divorce with his wife before he left her; this is shown not only by the testimony of the respondent, corroborated by that of Donald, but is clearly indicated by one of the letters which libellant sent to respondent. It is significant that in the letter of October 15, 1915, in which he recites his alleged reasons for leaving the home that he makes no mention of the alleged conversation with the brother of respondent, to which he testified before the master. These, and numerous other things in the testimony, show such an apparent case of management and scheming on the part of libellant to provoke desertion on the part of his wife, as acquits her of the charge of wilful and malicious desertion. Considering the case on its merits, as we have done, we do not find that the libellant has made out any such case of wilful and malicious desertion by his wife as is required in law to be the foundation

for a decree of divorce. We are constrained to conclude from the evidence, that whatever desertion there was in the case was brought about by the acts of the libellant himself, and that he is not entitled to the decree which he seeks.

The decree of the court below is reversed, and the libel is dismissed at the cost of the libellant.