## Stewart *v.* Stewart, Appellant.

*Divorce—Cruel and barbarous treatment—Attempt to poison—Evidence—Findings of master—Review by court—Act of April 20, 1911, P. L. 71.*

The Act of April 20, 1911, P. L. 71, does not confer upon the Master in divorce the power of a Master in equity, nor give his report of the proceedings and opinion in the case the force and effect of the latter's findings of fact.

The Act of 1911 effected no change in the duty of the court below, or of the Appellate Court on appeal, to review the evidence and adjudge whether it established the statutory ground for divorce alleged in the libel.

A decree granting a divorce on the ground of cruel and barbarous treatment, which consisted of an alleged attempt by respondent to poison the libellant, will be reversed, where the charge against the respondent was not clearly established by the evidence.

Argued November 19, 1925. Appeal No. 265, October T., 1925, by respondent, from decree of C. P. Huntingdon County, May T., 1924, No. 20, in the case of J. Guy Stewart v. Isaphine L. Stewart. Before PORTER, HENDERSON, TREXLER, KELLER, LINN and GAWTHROP, JJ. Reversed.

Libel in divorce. Before BAILEY, P. J.

The facts are stated in the opinion of the Superior Court.

The case was referred to James S. Woods, Esq., as Master, who recommended that a divorce be granted.

On exceptions to the master's report, the court dismissed the exceptions, and granted a divorce.

*Error assigned* was the order of the court.

*Chas. C. Brewster,* for appellant.

*Wm. Wallace Chisolm,* for appellee.

OPINION BY KELLER, J., April 19, 1926:

The learned court below adopted "with reluctance" the recommendation of the master that a divorce be granted the libellant in this case, apparently because he considered the findings of a master to "have equal weight with the verdict of a jury"; and that he was forced to adopt the master's recommendation if there was evidence in the record "upon which the master could reach the conclusion at which he arrived."

The court misconceived the effect to be given the report and recommendation of a master in divorce. The Act of April 20, 1911, P. L. 71, does not confer on the master, whose appointment it authorizes, the same powers as a master in equity nor give his "report of the proceedings and opinion in the case" the force and effect of the latter's findings of fact: Burns v. Burns, 84 Pa. Superior Ct. 489, 490. "We have repeatedly held that the report of the master, appointed under the provisions of this statute, is advisory only. It was not intended that judicial functions should in any material degree be relinquished by conducting the proceedings before a master in his office........It still remains the duty of the court to exercise its own independent judgment, as to the law and the facts": Humphreys v. Humphreys, 85 Pa. Superior Ct. 488, 490; Micheals v. Micheals, 65 Pa. Superior Ct. 464, 466. The Act of 1911 effected no change in the duty of the court below or of this court on appeal, to review the evidence and adjudge whether it does in very truth establish the statutory ground for divorce alleged in

the libel: Burns v. Burns, supra; Howe v. Howe, 16 Pa. Superior Ct. 193, 195; Giles v. Giles, 80 Pa. Superior Ct. 469, 470. "The family relation lies at the foundation of our social system and divorces are not to be granted save for the very cause alleged in the libel, *clearly established* by evidence": Williams v. Williams, 85 Pa. Superior Ct. 473, 478.

The ground for divorce alleged in the libel was cruel and barbarous treatment; the specific act charged, attempted poisoning of the libellant.

Owing to the old age of respondent's mother and the consequent necessity of having some one look after her, the libellant and respondent broke up housekeeping in the spring of 1923 and went to board with respondent's mother. In October of that year the libellant became unreasonably provoked because he was asked to pay his board in the middle of the month instead of at the end, and left the house and went to board with his sister nearby. His wife and her mother went to Ohio on a visit and while they were away he complained of some stomach trouble; writing, in several letters to his wife in November and December, "I am knocked out in my stomach"; and "I have been on the rinky dink." On her return home at the end of the year libellant lived with her for four or five days, until his mother-in-law arrived and then went back to his sister's. His general health was not good. Baker's bread did not agree with him. His wife baked her own bread; he liked it and asked her to send him over some home-made bread. She baked about every week and sent him a loaf of each baking. On January 9, 1924, she sent him a loaf, some of which he ate with milk. He became sick that night. Libellant's nephew also ate of it, without any harmful effects. Some ill feeling existed, or sprang up, between his sister and the respondent. The latter was not allowed to see her husband alone, and resented it. When respondent sent over her next loaf, libellant's sister had her son take

it with the "heel" of the first loaf to a local chemist for analysis to see if it contained poison. He first reported that the analysis showed a very small residue of alkaloid or alkaloids, which could not be identified because of the small amount; but a few days later reported that it contained traces of atropine. Respondent's next loaf was likewise sent by libellant's sister to the chemist, who reported tests for atropine, strychnine, etc, without success, but that a test for meconic acid showed the presence of morphine. Libellant's condition grew so bad that on January 26 a doctor was called in, to whom the sister communicated her suspicions, notwithstanding the fact that libellant had eaten none of respondent's broad for over two weeks. The doctor testified that libellant's symptoms might have been due to disease or might possibly have been caused by drugs, particularly atropine and strychnine. He thus described the symptoms referred to: The patient's muscles were twitching and he could not talk very well; his heart was more or less excited and he was not able to control his muscles; he complained of more or less dryness of the throat and mouth, but the pupils of his eyes were practically normal. Thereafter every loaf of bread respondent sent her husband was taken to the chemist. He reported that the loaf delivered January 31st showed no trace of any alkaloid;. that delivered February 8th showed atropine; that delivered February 15th showed no alkaloid; that delivered February 21st showed traces of strychnine and morphine.

No testimony was given as to the medicines which had been taken by libellant during his illness prior to the doctor's being called—there was testimony that a brother, who claimed to be a nerve specialist, had been treating him for some time previously. Nor was there any evidence as to what medicines the doctor himself prescribed. In view of the fact that libellant's illness did not become serious until over two weeks after he

discontinued eating his wife's bread, and that the symptoms described are not unusual in nervous cases, we find no substantial evidence that any poison had been administered to him. Dryness of the throat may result from other causes besides atropine and most probably does when the pupils of the eyes are not dilated. The heel of the loaf of broad, of which he had eaten, was not separately analyzed. No search was made of respondent's home to see if there was any atropine, strychnine, or morphine to be found there, nor any attempt made to prove her purchase or possession of those drugs or any of them. She stoutly denied the whole charge. Said she had baked the bread as she had always done; denied having put any poison in it or that she had any such poisons in her possession; averred that she had never heard of atropine until the bringing of the suit; testified to her affection for her husband; and stated her belief that the divorce proceedings were the result of the intrigues and interferences of his relatives.

The decision of the case must very largely depend on the weight to be given the chemist's testimony. We are not sufficiently persuaded of the correctness of his analysis and the accuracy of his judgment to adjudge that the charge against respondent has been clearly established; to arrive at an abiding conviction of its truth: Naylor v. Naylor, 59 Pa. Superior Ct. 547, 561. Before we affirm a decree of divorce we must consider the evidence and determine that it satisfactorily establishes the facts which under the express authority of the statutes authorize the entry of a decree: Micheals v. Micheals, supra, p. 467. See also Middleton v. Middleton, 187 Pa. 612, 615; Best v. Best, 161 Pa. 515, 516. In the first place, the chemist's testimony on the hearing was stronger than his written reports, made at the time, and afterwards introduced in evidence. Where he reported having only found *traces* of a drug, he testified the analysis showed its presence. He did not

state what quantity of the bread he used in making his analyses nor the re-agents used to secure the color reactions upon which alone he based his judgment; nor, even, the actual color reactions obtained, so that they might be checked and verified. He apparently obtained no crystals of strychnine, for he produced none, and made no further tests to confirm his judgment based on color reactions. At the first hearing he was unable to testify as to the amount of atropine, strychnine and morphine, respectively, found in the bread, but on a later occasion he gave evidence, based on some calculation from his unproduced notes, made since the first hearing and which is certainly not clear or enlightening to us, from which he computed that the first loaf contained one-seventh of a grain of atropine; the second, none; the third, a faint trace, one-seventh or less of a grain of morphine; the fourth, none; the fifth, one-seventh of a grain of atropine; the sixth, none; and the seventh, one-fifth of a grain of strychnine and less than one-seventh of a grain of morphine. This did not correspond with his original testimony nor agree with his written reports, which, in every case but two, had shown only traces of these drugs. Strychnine is the bitterest substance known to man. A loaf of bread impregnated with a solution of one-fifth of a grain of strychnine would have a bitter taste; but no one tasted this loaf to see if it was bitter. It is not necessary to refer to the other matters which render us doubtful of the truth of the charge against respondent. It is not established to our satisfaction. Giving full consideration to all the evidence and reviewing it in the light of the master's report, we are not satisfied that it in very truth establishes the ground for divorce alleged in the libel. We are accordingly constrained to reverse the decree.

The decree is reversed and the record remitted to the court below with directions to dismiss the libel at the costs of the libellant.