**Ulizio *v.* Ulizio, Appellant.**

Argued March 12, 1929.

92

Before Trexler, Keller, Linn, Gawthrop, Cunningham and Baldrige, JJ. ▉

*Francis Shunk Brown,* and with him *Charles McVeigh Willits* and *Ira Jewell Williams,* for appellant.—Respondent did not desert libellant: King v. King, 36 Pa. Superior Ct. 33; Moses v. Moses, 77 Pa. Superior Ct. 154; Pearce v. Pearce, 53 Pa. Superior Ct. 129; Bracken v. Bracken, 77 Pa. Superior Ct. 219; Pomerantz v. Pomerantz, 71 Pa. Superior Ct. 241; Olson v. Olson, 27 Pa. Superior Ct. 128.

*Joseph P. Gaffney,* and with him *Frederick W. Bauer,* for appellee.—Respondent deserted libellant wilfully and maliciously without reasonable cause: Leonard v. Leonard, 67 Pa. Superior Ct. 412; Murray v. Murray (No. 2), 80 Pa. Superior Ct. 575; McIntyre v. McIntyre, 92 Pa. Superior Ct. 310; Hedderson v. Hedderson, 35 Pa. Superior Ct. 629.

Opinion by Cunningham, J., April 10, 1929:

On October 31, 1925, Bernard G. Ulizio, claiming to have been a resident and citizen of the State of Penn-

sylvania and City of Philadelphia for one and one-half years, filed in the court below his libel for a divorce from his wife, Frances M. Hagan Ulizio, to whom he was married at Atlantic City, New Jersey, on June 1, 1921, when both were citizens of that state; the ground alleged was her willful and malicious desertion on December 19, 1921, and absence from their habitation (Kelmore Apartments, Atlantic City), without a reasonable cause for and during the term and space of more than two years.

Respondent, appellant herein, defended the action upon two grounds: first, that libellant was a citizen and resident of New Jersey at the date of the filing of the libel; and second, that she did not desert libellant on December 19, 1921, but cohabited with him until February 1, 1922, when libellant deserted her by locking her out of, "and refusing her admission to, their home and habitation." The case was referred to a master who found in favor of libellant upon the question of residence but in respondent's favor upon the charge of desertion. The master reported that immediately following their marriage they cohabited as husband and wife at the Kelmore Apartments, Atlantic City, until they separated, after which respondent went to reside with her mother at her present address, No. 6 N. Derby St., Ventnor, N. J. He found further that libellant remained at the Kelmore Apartments for more than two years and then moved to the Jeanette-Berg Apartments, Atlantic City, where he still maintains an apartment for use during business trips to Atlantic City, but that on June 20, 1924, he took up his residence at the Courtland Apartments, 43rd and Chestnut Streets, Philadelphia, Pa., where he was residing when the testimony was taken; that libellant's business interests required him to leave the State of New Jersey and become a resident of Pennsylvania and that he began his residence in Philadelphia in good faith and not for the purpose of endeavor-

ing to use the courts of this jurisdiction to procure a divorce. On the question of desertion the master reported that libellant had failed to sustain the allegations in his libel and recommended that it be dismissed. Both parties filed exceptions to the master's report and the court below returned it for an analysis of the evidence relative to the charge of desertion. In a supplemental report the master reaffirmed his conclusion that libellant had not met the burden resting upon him to show that respondent willfully and maliciously deserted him. Exceptions to this supplemental report were filed by libellant. The common pleas sustained his exceptions, refused the recommendation of the master, and entered a decree granting libellant an absolute divorce. Respondent has appealed from this decree.

In addition to assigning the final decree for error, appellant alleges by her assignments that the court below erred in sustaining libellant's exceptions to the original and supplemental findings of the master on the subject of desertion and in failing to sustain her exceptions to the original report upon the question of residence of libellant. We shall not consider in detail the last mentioned assignments as we are satisfied from an examination of the testimony that the court below had jurisdiction of this case. This court stated in Hilyard v. Hilyard, 87 Pa. Superior Ct. 1, 4, that our divorce statutes require as a jurisdictional requisite to the bringing of an action for divorce a full year's actual, bona fide residence within the Commonwealth prior to the filing of the libel; but that they also recognize "that the husband and wife, at least in so far as respects an action for divorce, may have separate and distinct residences; that the residence of the husband does not determine that of the wife so as to govern her right to a divorce; that a person who has acquired a bona fide residence in this state and actually resided here for a year may

bring his or her action in divorce though the offending spouse never resided within the Commonwealth and the cause of action arose out of it." See also Reed v. Reed, 30 Pa. Superior Ct. 229.

The decree in this case is not based upon the finding of a jury and we are therefore required to review and analyze the testimony for the purpose of ascertaining whether it sustains the complaint of the libellant: Nacrelli v. Nacrelli, 288 Pa. 1. Through the performance of our duty in the manner directed in the case just cited we have reached a conclusion upon the question of desertion which differs from that of the court below and is in harmony with the general findings of the master. The statutory ground relied upon by libellant was willful and malicious desertion and absence from his habitation without a reasonable cause, willfully and maliciously persisted in for two years. Mere separation for the statutory period is not sufficient. In King v. King, 36 Pa. Superior Ct. 33, our former President Judge Rice reviewed the authorities and stated the principles applicable to the issue in this case in these words: "Desertion is an actual abandonment of matrimonial cohabitation, with intent to desert, willfully and maliciously persisted in without cause for two years. The guilty intent is manifested when, without cause or consent, either party withdraws from the residence of the other. . . . . . The guilty intent to desert is rebutted where the separation is encouraged by the other party or by mutual consent. Mutual consent to the separation, not revoked by either party, is as fatal to an application for divorce upon the ground of desertion as would be acts on the part of the libellant which would give the respondent legal cause to leave him and to obtain a divorce from him. . . . . . . What may have been desertion in its inception, but has become a separation with mutual consent within two years, is not ground for divorce. . . . . . Again, the mutual con-

sent that will prevent a divorce upon the ground of desertion may be inferred from the conduct of the parties, and need not be put in the form of a solemn written agreement.'' The malice of a desertion arises from the perverse act of one of the parties in abandoning the home against the will and desire of the other and perversely continuing in such withdrawal.

In some particulars the testimony in this case is in irreconcilable conflict and the correct determination of the issues of fact requires an investigation into the apparent frankness and veracity of the parties and a consideration of all the circumstances from which their motives and intents may be gathered. The marriage was apparently an unhappy one from the beginning. Libellant, a real estate and bond broker, was thirty-two years of age and had been married before; appellant was ten years his junior; no children were born of the union. Their acquaintance, which seems to have been comparatively brief, grew out of the fact that libellant was a boarder in the home of appellant's mother at Atlantic City. Within seven months after their marriage appellant in a letter to libellant said: ''I have been married since June and I have yet to remember one day that you made happy for me. It has just been a routine. Don't get me wrong. You've not deliberately made my days unhappy. You've just neglected to think of me before you have of others. ...... You've even told people there is no love between us.'' We shall not attempt to analyze in detail the two hundred printed pages of testimony found in this record; reference will be made only to such portions as have a direct bearing upon the charge of desertion.

It is perfectly clear that these people drifted apart by reason of many and diversified causes, but it is not clear, even if we accept at its full face value libellant's version of the matter, that there was a willful and malicious desertion by appellant. Libellant fixes

definitely December 19, 1921, as the date of the alleged desertion. The testimony indicates that libellant was frequently absent from their apartment for considerable periods of time prior to that date. His testimony relative to the events of that evening reads: "I went home to the Kelmore Apartments, and I found the apartment all lit up, and no one at home. About twenty minutes later Mrs. Ulizio came in, and she said, 'I have just come from the office.' She said, 'I have decided to leave you.' I said 'You have?' She said, 'Yes.' I said, 'Haven't you picked a poor time of the day to do that?' She said, 'No, I am going back to mother's.' She grabbed a few night clothes and things and shot out the door—got in my car and drove away." He then stated that three or four days later he went to the apartment one afternoon to prepare for a two weeks' trip to Chicago and found his wife, with the assistance of a friend, packing her clothing. His account continues: "Q. They were both there when you came back? A. Yes, she and her girl were there packing up things, and I said, 'What are you doing?' She said, 'All these things belong to me —I am going to take what I want.' I did not say anything. The girl was there. I changed my clothes —went out and made my train. That is the next time I saw her."

It is at least significant that libellant's only protest against appellant's proposed withdrawal from the home was that "she had picked a poor time of the day to do that." Although consent to a separation is not to be inferred from mere acquiescence (Leonard v. Leonard, 67 Pa. Superior Ct. 412), yet the absence of any real protest on the part of libellant is a fact to be considered in connection with the other circumstances in this case (Pearce v. Pearce, 53 Pa. Superior Ct. 129). That libellant was not entirely frank when examined by the master is apparent from the fact that in his direct examination he stated that the first

time he saw his wife after his return from the west was on the night of an election in Atlantic City some time in February, 1922, under circumstances which he thus described: "Election in Atlantic City—we were over to the precinct and we were waiting for the votes to be counted, and I was chasing the boys around to get the box in and the boys said, 'Don't you think it is about time to get us a drink?' I said, 'All right, let us go around to the apartment and get a drink.' So I went around to the Kelmore Apartments. I had a couple of bottles of liquor in the bedroom in the closet. I pushed the light, and went to get the liquor, and I found Mrs. Ulizio in bed. I felt very much embarrassed, but I got the liquor, came out and gave it to the boys, and then went back. I said, 'What are you doing here?' She said, 'Our bathroom was cold. I came back here to take a bath and I laid down and fell asleep.' Then I went out again."

It is difficult to believe that his failure to refer in his examination by the master to the circumstances of a visit by appellant to him, at his instance, on the night of January 19, 1922, hereinafter referred to, was entirely inadvertent. Appellant in her testimony positively denies any desertion upon her part at any time. Her testimony relative to the events of December 19, 1921, reads: "I didn't desert him then, because he gave me a big car that day, in front of his business place. I lived in the apartment until two or three days before Christmas of that year. Then he told me he had to take a trip to Buffalo, and couldn't take me with him. It was our first Christmas but he said we couldn't spend it together and he advised me to go to my mother's and he would let me know when he would be back. He expected to be gone two or three weeks. I took some clothes and went to mother's, and I called his office off and on, and I went down to the apartment and looked around. ...... He didn't know just when he would be back. I called up his

office off and on, when I saw his car in town, and they said they didn't know when he would be back. I was passing on the avenue and his car went along, so I went down to the apartment and slept there off and on, whenever I thought he would be in town. When I wasn't sure he was in town, I would go to mother's.'' Libellant's contention that appellant deserted him on December 19, 1921, is contradicted by the testimony of appellant's sister—a teacher in Hartford and home for the Christmas vacation—who testified that while she was at the Kelmore Apartments visiting her sister on the 23rd or 24th of December she there met libellant for the first time since his marriage to her sister. This witness also stated that when she asked libellant what he intended to give her sister for Christmas he showed her a ring on his finger and told her he intended to give it to appellant. In his direct examination libellant testified that he was in Chicago from ten days to two weeks following the 19th of December but said in a subsequent part of his testimony (after stating that he did not recall telling appellant's sister about the ring) that he was at New Haven, Conn., for the holidays and that his recollection was that he left Atlantic City December 21st. No explanation of these contradictory statements concerning his whereabouts during the holidays of 1921 was offered.

Another important incident throwing light upon the relations of the parties subsequent to the date of the alleged desertion is the fact that on January 19, 1922, libellant called appellant at her mother's home, told her he was ill and asked her to come to him at the Kelmore Apartment. Appellant responded immediately and testifies that she found libellant in a highly nervous condition; that she tried to call his physician, Dr. Pennington, on the phone but was prevented by libellant; and that after he calmed down they talked matters over and she assured him of her willingness to continue marital relations with him, to which he

replied, "All right, we will straighten this thing up. Have you any clothes?"

Her account of the interview continues: "I said, 'I haven't anything except what you gave me this summer.' He said, 'Buy yourself an outfit, and we'll have a new honeymoon.' I only had a suitcase at mother's and he said, 'Come back here on the first of the month.'" She added that libellant told her to take a friend with her to Philadelphia and buy an outfit. Although libellant made no reference to this incident in his examination by the master, and indeed denied that he was with appellant that night, he subsequently admitted that he had called her and that she had spent the night with him. Appellant testified that libellant had intercourse with her the following morning. This statement was positively denied by libellant who stated that he was quite ill; that Dr. Pennington wanted him to go to a hospital and that he stayed in bed for five days. Dr. Pennington was not called, nor was his absence as a witness accounted for. Even if the truth of this disputed matter were with appellant, the fact would have no controlling effect in this case: Danforth v. Danforth, 88 Me. 120, 31 L. R. A. 608. Libellant subsequently gave her $200 for clothing and she reported to him in detail with relation to its expenditure. Appellant testified that upon her return from Philadelphia with her outfit she found the lock on the apartment door had been changed and that when she succeeded in getting libellant on the phone the following conversation took place: "I said, 'What's the idea of the new lock?' He said, 'I'm giving the apartment up.' He said, 'If you stay there you will have to pay the rent.' I said, 'I thought you and I were going away on a second honeymoon?' He said, 'That's all off.' I said, 'I've got to get into that apartment, I have some things there, but I can't keep the rent up.' He said, 'I'm not going to talk about it.' I said, 'I'm

going to get my clothes and things.' He said, 'Be careful who you get to break in here,' and I went after Magistrate Paxson, to go with me to the apartment, and I tried to open the door, so I could get my things but I could not open it. Mr. Ulizio came in the vestibule door and he had two keys, and he opened the apartment. He went in and he slammed the door. I rang the bell to see if he would open it for me, I said, 'Aren't you going to let me in?' And he said, 'No.' "

Magistrate Paxson, when called, corroborated appellant with reference to her inability to gain access to the apartment but testified that he did not see anything of libellant upon that occasion. There was evidence that libellant subsequently sent appellant's furniture and clothing to her mother's home in a van.

Considerable space was devoted in the testimony to evidence descriptive of libellant's relations with other women, both before and subsequent to the separation. Detailed consideration of this testimony is unnecessary under the issue as made by the parties; its relevancy to that issue is slight. This is not a case in which appellant concedes that she left her home and endeavors to excuse or justify her withdrawal by showing that libellant's conduct amounted to a "reasonable cause" within the meaning of the statute, but one in which the desertion is denied. It is well settled that the only "reasonable cause" which would justify a desertion must be such as would authorize a dissolution of the marriage bond. Where the desertion is conceded or shown it will be presumed to be willful and malicious unless the withdrawing party can justify or excuse it by showing such conduct on the part of the other as would entitle him or her to a divorce: Rosa v. Rosa, 95 Pa. Superior Ct. 415, and cases there cited. The only material bearing this evidence might have would be upon the good faith of the request which

libellant testifies he made to appellant that she return: Litch v. Litch, 89 Pa. Superior Ct. 15, 29.

But there is clearer and better evidence in this record that within two years after appellant's exclusion from the Kelmore Apartment the parties became mutually indifferent to each other and neither had the slightest desire or intention to resume marital relations. It is perfectly obvious that libellant's statement at the first hearing that he had asked appellant "two or three times" to come back was made solely for the purposes of this case.

Whatever may have been the nature of the original separation it is impossible to escape the conclusion that within two years it became the kind of a separation by mutual consent which is fatal to an application by either party for a divorce upon the ground of desertion: King v. King, supra.

Appellant, with the assistance of her mother, opened a beauty shop at Atlantic City. Under date of June 30, 1922, she wrote libellant, reproaching him for what she describes as "the rawest deal" anyone could give "a wife of six months;" for his infatuation for another woman; and for reporting that he was assisting her in her business. The letter concludes: "I am utterly disinterested in you and wish to forget everything ever connected with you so if you will refrain from including me in any way in your conversations you will confer upon me the one favor I have ever asked you."

During the year 1923 libellant was made the defendant in an action instituted in the courts of Atlantic County, N. J., by Herman G. Mulock, in which libellant was charged with alienating the affections of the plaintiff's wife; the proceeding resulted in a verdict against libellant in the sum of $25,000 and was subsequently settled by the payment of $18,000. Appellant testified that libellant asked her to come to

his office the day the papers announced the institution of this suit and proposed to her that she should get a divorce, adding, ''Well, it is just this: there is no use of our being tied together, and I am willing that you shall get a divorce; you go ahead, and I will give you $25 a week until you remarry again. ......Make up your mind one way or the other, because if you don't divorce me, I will divorce you.'' In this she was corroborated by a witness who heard part of the conversation. Libellant's attitude toward appellant was disclosed in the following excerpt from his testimony in the Mulock case, admitted in evidence in the present proceeding: ''Q. Mr. Ulizio, what did you say to her about a divorce on this occasion? A. I said to her, and I have spoken to her several times about her keeping herself tied to me, there was no need of it, that I wasn't interested in what she was doing, didn't make any difference to me what she did, I would support her as long as she was unmarried and for her to either decide whether she was to get a divorce or whether I was to get one and let me know. She told me that she would talk to her mother about it and let me know.'' There was also evidence that libellant regularly contributed, during the pendency of these proceedings, very considerable sums toward the support of appellant. While not conclusive, such voluntary contributions, along with many other acts shown by the testimony, are inconsistent with his present contention that appellant was wilfully and maliciously absenting herself from his home: Olson v. Olson, 27 Pa. Superior Ct. 128. A divorce will not be granted unless the ground alleged in the libel is clearly established: Stewart v. Stewart, 88 Pa. Superior Ct. 1, 3; Lewis v. Lewis, 95 Pa. Superior Ct. 584.

After a careful examination of the entire record we are convinced, by a clear preponderance of the cred-

ible testimony, that libellant has failed to sustain the charge contained in his libel.

The decree of the lower court is reversed and the record remitted with instructions to dismiss the libel, the costs of this appeal to be paid by the libellant.