## Quinn v. Quinn.

*Divorce—Practice, C. P.—Master's report—Exceptions—Improper exceptions.*

1. Exceptions to a master's report in divorce, based upon mere excerpts from the discussion in the report as to findings of fact and conclusions of law, are improper and will not be considered.

*Divorce—Cruel and barbarous treatment—Commission of unnatural crime —Sodomy—Evidence.*

2. Where a wife sets up as the ground for divorce indignities to her person and alleges the commission without her consent by the libellant of an unnatural crime upon her person causing physical injury, she must establish the allegation by clear and strict evidence.

3. If she continues to live with her husband for many years after she alleges such practices began, without any complaint made to him, or any substantial complaint made to others, and without any outward evidence of physical injury or any disclosure to her physician, her mere personal testimony that the crime was committed will not be sufficient to establish the existence of the offence.

*Divorce—Separation by consent—Residence for one year—Act of March 13, 1815.*

4. Where a wife leaves her husband's domicile with his consent, she cannot acquire either a legal residence or an actual domicile in Pennsylvania under the Act of March 13, 1815, P. L. 286, until the period of her separation from her husband by his consent has ended.

5. A libellant must have resided in the State with domiciliary intent one whole year previous to the filing of a libel in divorce.

6. The laws of Pennsylvania are not to be used to make this State a transitory residing place to secure divorces.

Exceptions to master's report. C. P. Schuylkill Co., Jan. T., 1923, No. 188.

*J. F. Mahoney* and *D. W. Bechtel,* for libellant.

*Carl W. Wagner,* for respondent.

BERGER, J., Feb. 9, 1925.—This action of divorce is founded on charges (1) of cruel and barbarous treatment, endangering libellant's life, and (2) the offering of such indignities to her person as to render her condition intolerable and her life burdensome, thereby compelling her to withdraw from his (the husband's) house and family. The respondent, answering the libel, denied all the charges against him, and averred that the libellant was not a citizen and a resident of Pennsylvania for one year previous to the filing of her libel. The case was heard before a master, to whose report recommending a decree twelve exceptions have been filed. The 1st, 3rd and 6th exceptions are based entirely on excerpts taken from the discussion of the master in support of his findings of fact and conclusions of law, and are, therefore, without legal

merit as a matter of practice. The 4th, 7th and 8th exceptions charge the master with giving consideration to irrelevant and immaterial testimony introduced by the libellant, and the 2nd and 5th exceptions with disregarding material and relevant testimony introduced by the respondent. The exception which may be decisive, to which the 10th, 11th and 12th are merely collateral, is the 9th, charging that the evidence is insufficient to support the master's 5th, 7th, 8th, 9th, 10th and 11th findings of fact. Of these findings, the 5th and 7th, if sustained, establish the statutory requirement of libellant's bona fide residence in the State, and the 8th, 9th, 10th and 11th, if sustained, the grounds of divorce as alleged. The 9th exception, in so far as it involves the sufficiency of the evidence to establish the charges made against the respondent, will, therefore, be considered first, and then the question of the jurisdiction of this court.

The parties were married Sept. 17, 1909, in New Jersey, where both were resident. They have one child, a son, born Aug. 27, 1911. On Nov. 20, 1921, while living at Rene Place No. 10, in Brooklyn, N. Y., they separated, the libellant claiming that the separation was by mutual consent and to be permanent, whereas the respondent claims that it was to be for a period of not more than three weeks, and that his consent was only given when he could not dissuade his wife fully from her purpose of leaving him. Eight or nine years immediately preceding this separation they had lived at Orange, New Jersey, and thereafter at various places in Brooklyn. During this period they always had from one to four boarders, of whom Charles Johnson was one. He boarded with the family continuously for about eight years, or until April or May, 1921, when he went to Lakewood, New Jersey, where he stayed until November, 1921, when he visited the respondent's house for a week and then went to Pottsville, Pa. The libellant claims her husband told her he maintained an apartment for another woman, and since he and she were both unhappy, he agreed to their separation, packed her trunk and gave her a bouquet of flowers to carry on her journey to Pottsville, Pa. The husband's version is that he found a letter in the letter-box of their apartment postmarked Pottsville, Pa., Nov. 10, 1921, addressed to his wife, in Johnson's handwriting, which he gave to her, who, after having read it, reluctantly gave it to him to read, and then permitted him to keep it on his assurance that he would show it to no one else. The letter was evidently written shortly after Johnson had left Quinn's house to go to Pottsville and soon after his arrival there. It discloses that Mrs. Quinn had agreed to follow him, and in it he told her that his sister Mabel (Mrs. Armbruster, No. 23 South Centre Street, Pottsville, Pa.), with whom he was living then, would write and invite her to make a stay with her until they (Johnson and Mrs. Quinn) could go to live in a certain city where he had obtained a job and provided a home for themselves. Johnson admitted in the letter that his assurance had failed him when confronted with the task of talking to her husband about obtaining a divorce from her, expressed his sympathy for her husband in his unfortunate plight, described his love for her and their love for each other as of the sort which comes but once and never dies, declared his unbounded confidence in her constancy, and subscribed himself, "With love, Your sick boy." At first she denied to her husband the receipt of any other letters from Johnson, but later admitted the previous receipt of some other letters, and said she was sick, and tired of everything around her house, and that she intended to go with Johnson. Her husband then offered to send her to a sanitorium for treatment, or have himself transferred to California, being then employed in the United States Air Service, if she would agree to go there with him. Per-

sisting in her refusal to go with him, he then asked his brother-in-law, William G. McLaughlin, Esq., a member of the New York bar, to come to his home and join with him in a final effort to dissuade his wife from her intended course. A family conference at the home of the respondent, consisting of the parties, the respondent's sister, married to Mr. McLaughlin, and Mr. McLaughlin, was then held, during which appeals were made to the libellant not to desert her husband and her only child for Johnson, but she, adhering to her predetermined course, gave no other reason for it than her great love for Johnson and her inability to live without him. Throughout the conference, lasting more than an hour, she made no charges against her husband except that he was selfish, inconsiderate and became drunk about twice a year. She had shown a letter received by her from Johnson to her girlhood friend, Mrs. Anna Bell Flanders, when she visited in her home on July 11, 1911, in which Johnson proposed that they should go away together, take the child with them and induce her husband to get a divorce. To Mrs. Flanders she declared her own feeling of shame, but said that she could not live without Johnson, and expressed a strong desire to obtain something against her husband to enable her to divorce him, and also a fear that she "could get nothing on him." The morning after the conference, Nov. 20, 1921, the respondent having failed to get his wife to change her mind and remain with him, agreed that she might go to Pottsville for three weeks to be near Johnson, in order to enable her to determine whether she could not change her mind and return to him at the end of that period. When this period had expired, he called her on the 'phone from Long Island City and asked her decision, which was that "she was going to stay with Charlie." On Dec. 29, 1921, accompanied by their son, he was in Jersey City and called his wife on the 'phone at Pottsville, requesting her to meet him and their boy the following day in Philadelphia, and when she did not assent, the boy talked to her over the 'phone and she agreed to meet them, which she did, at Green's Hotel, but refused to reconsider her action and return to her husband, because she was happy with Charlie. Early in January, 1922, he called Johnson on the 'phone at Pottsville and asked him to send his wife back to him, but Johnson inquired of him whether she (Mrs. Quinn) had not talked to him and arranged it all, and further said "there is no need to get fresh about it; you will find out." This telephone conversation was followed by a letter from the libellant to her son and one to her husband, both in one enclosure, postmarked Pottsville, Pa., Jan. 13, 1922, of which the latter is as follows:

"Dick please do not call me any more you make me so nervous. Do not call Mr. Johnson you know that he has nothing to do with us at all. You promised you would never annoy me so please forget me and help me so I can be married as soon as possible. If you annoy me too much I will leave and no one will know where I am. You threating to shoot yourself or any other person you certainly must forget for that sure would make things very bad for our Boy. Please Love him and be good. And do not let them tell him a lot of untrue things about me." Signed, (Tillie). Salutation, lower left-hand corner, (Dick).

The master has found (10th and 11th findings of fact) that the respondent, during the entire period of his married life, at stated monthly periods, by force, committed the crime of sodomy on the body of his wife, and (8th and 11th findings of fact) at like monthly periods on several occasions tried to force her to submit to the commission of a cognate and even more repulsive crime, thus rendering her condition intolerable and life burdensome, and thereby compelling her to withdraw from his house and family. All the other

low and humiliating charges made against the respondent, in the bill of particulars filed by the libellant, the master has properly dismissed for want of satisfactory evidence. If the findings of the master are sustained by the evidence, undoubtedly the second cause of divorce as alleged is established. We have carefully considered all the evidence, and after having given due weight to the master's report, in accordance with the principle stated in Micheals v. Micheals, 65 Pa. Superior Ct. 464, 466, 467, have reached the conclusion that his basic findings of fact are not established by the evidence, for reasons which we shall presently state.

The respondent, in his answer and in his testimony, unequivocally denied his wife's charges of crime made against him. Of the major crime charged against him, Blackstone has said (4 Blackstone's Comm., 215) : "But it is an offence of so dark a nature, so easily charged and the negative so difficult to be proved, that the accusation should be clearly made out; for, if false, it deserves a punishment inferior only to that of the crime itself." In finding in favor of the libellant, the master appears to have attached great weight to her alleged corroboration by her sister, Lucy Heinhauser, and has apparently ignored the surrounding circumstances of the case, many of which show that the libellant did not do what a reasonable person placed in her situation, if the charges be true, would probably have done. In speaking of this alleged corroboration, the master says: "She is corroborated to some extent by the testimony of her sister, Lucy Heinhauser, who testifies that libellant frequently complained to her of her husband's actions in this respect, and who also says that libellant's health was greatly affected while cohabiting with respondent." Miss Heinhauser testified that on one of many visits in the respondent's home, noticing that her sister was apparently unable to sit down or walk about without difficulty, after having arisen in the morning, upon being inquired of as to the cause of her trouble, in the absence of her husband, she ascribed it to an act of sodomy committed by him upon her during the preceding night, and then, under a leading examination-in-chief to develop complaints of a similar nature, Miss Heinhauser said: "She told me right along; right after they were married he started that treatment of her." The libellant did not refer in her testimony to the incident of which she is alleged to have complained to Miss Heinhauser, but said she had complained to Miss Quinn, now Mrs. McLaughlin, of those "things," meaning the acts alleged to have been committed by her husband upon her, but no time when the complaint was made is fixed. In the bill of particulars which she filed, and in her cross-examination, the beginning of the commission of the crime of sodomy, as well as the attempts to commit the cognate crime, is fixed as of the year 1913, and in her cross-examination she qualified her alleged complaint to Miss Quinn by saying she told her, "Dick tries to do the same thing to me," referring to a conversation which she had with Miss Quinn, who told her some of the unsavory features of divorce cases which came to her husband's notice in his practice. Mrs. Armbruster, too, testified that on a visit to the Quinn's in New York, Mrs. Quinn told her "how her husband was treating her, the unnatural things," and to this complaint the libellant also made no reference in her testimony. The libellant was competent to testify that she had complained of her husband to Miss Quinn and to Miss Heinhauser, her sister, and to Mrs. Armbruster, Charles Johnson's sister, both being also competent to testify that she had made complaints of a similar nature to them, but their testimony loses much of the force it might otherwise have because the libellant failed to corroborate them. Moreover, it has not been shown that the complaints said to have been made to Mrs. Armbruster and Miss Quinn were

Quinn v. Quinn.

made promptly after the alleged commission of the acts, and a prompt complaint in cases of this sort is an important test of the truthfulness and sincerity of the complainant: Com. v. Mtynarczyk, 34 Pa. Superior Ct. 256, 258. Assuming, for the sake of argument, that the single declaration of the libellant to Miss Heinhauser, complaining of a specific act against her husband, is competent, not merely to establish the fact of complaint made, but also of the details of the commission of the offence, the circumstances as narrated to Miss Heinhauser are not inconsistent with the commission of the offence with the libellant's consent, or at least without her resistance.

The parties to this action lived together as man and wife in Brooklyn and its vicinity from 1907 until the latter part of 1921, and during that period maintained friendly relations with their respective parents, whom they evidently saw with frequency, but no complaint was ever made by the wife against her husband to the parents of either of them. They had a number of friends with whom both were on terms of social intimacy, but to none of these, other than those already mentioned, did she ever complain. The family life of the parties was singularly free from petty quarrels, and the wife at no time accused her husband of the commission of the crime now charged upon him, either when they were alone or when they were in the presence of others. The libellant, after having confessed her illicit love for Johnson to Mrs. Flanders, July 11, 1921, did not justify her abasement by making charges against her husband, but expressed a fear, born of her faith in him, that she had no ground of divorce against him, and despaired of obtaining one. The family conference, the last resort to restrain the erring wife, brought no charge from her lips, and her explanation that she refrained from making the charge out of deference to the presence of Mrs. McLaughlin, nee Miss Quinn, is weak indeed, in view of her testimony that she had told Miss Quinn of her ground of complaint on a previous occasion. Miss Heinhauser said that the criminal acts of the husband were continuous during the entire period of his marriage to her sister, but the libellant, contradicting her, said these crimial acts had their beginning four years after their marriage, or in 1913, and continued thereafter until their separation, and this period is coincident with the period of her intimate contact with Charles Johnson. During the fourteen years of married life, this libellant had the care of physicians just three times; twice for the treatment of abortions, self-inflicted in 1915 and 1916, respectively, and the third time, two weeks before she left her husband, because she could no longer endure the physical suffering from the continued misuse of a private part of her person, and was in a nervous condition because of the treatment to which she had been subjected, but her physician ascribed her condition to her tonsils. Then, if never before, it was her duty to have made known to her physician the real cause of her condition, and through the discharge of an obligation due to herself, by submission of her person to his examination, have enabled herself to bring corroborative proof of the grave crimes which she avers were continuously committed upon her.

A divorce may be granted on the uncorroborated testimony of the libellant (Act of April 21, 1915, P. L. 154), but the courts will scrutinize it with extreme care, and will require strict proof of every essential fact in such cases: Buys v. Buys, 56 Pa. Superior Ct. 338, 342; Heimer v. Heimer, 63 Pa. Superior Ct. 476, 479. The infatuation of the libellant with Johnson and her desire to marry him were powerful inducements for the fabrication of the charges against her husband, and none could have been fabricated more difficult to defend. The course of the defendant in remaining with her husband for a period of eight years after his heinous treatment of her is alleged to

have commenced, without any complaint made to him or any substantial complaint made to others, and without any outward evidence of physical injury to her person, indicating resistance on her part during this period, is so unlikely, except upon the hypothesis of her own guilt, that it does not carry conviction to our minds. The importance of the marriage relation not only to the parties, but also to the public, demands that actions of divorce be supported by clear and strict evidence, and cases are not to be disposed of on a doubtful cast of the balance, but only by such proofs as satisfy the mind of the truth of the complainant's averments: Gold v. Gold, 74 Pa. Superior Ct. 70, 72; Altwater v. Altwater, 81 Pa. Superior Ct. 359, 361.

The libellant's residence was with her husband in Brooklyn, New York, on Nov. 20, 1921, when they separated. She then came to Pottsville, and, after having lived there continuously until Nov. 29, 1922, filed her libel. Jurisdiction is challenged on the ground that the libellant did not have a *bona fide* residence in Pennsylvania for one year previous to filing her petition or libel, as is required by the Act of March 13, 1815, § 11, 6 Sm. Laws, 28; 1 Purd. Dig. 1233. On the question of jurisdiction, see Gearing v. Gearing, 83 Pa. Superior Ct. 423, 424. The respondent has admitted the actual physical presence of his wife in the State for the period required to confer jurisdiction, but contends that her domiciliary intention did not conjoin with her residence, and that at least during the period of three weeks next succeeding Nov. 20, 1921, her absence from his home was with his consent and with an anticipation of her return to the common domicile. That the anticipation of his wife's return was common to both is shown by the attentions he paid her and her acceptance of them when they parted. The libellant's parents, who lived in New Jersey, invited her to their home when she conceived the purpose of leaving her husband, but she refused to go to them because she was ashamed, and Charles Johnson, the subject of her illicit love, had arranged a temporary abode for her with his sister in Pottsville, with whom he then lived. Her sole object in coming to Pottsville, as stated by herself, was to be with Johnson, with whom she was irresistibly infatuated, but whether the stay was to be permanent is left to inference. The employment which she had in Pottsville since her arrival was obtained after she had come. Her express and implied admissions establish conclusively that her domiciliary intention was entirely subject to Johnson's will, and what his domiciliary intention was we do not know, although it is quite clear that he did not regard Pottsville even as a permanent place of residence. This is a proper case for the application of the doctrine that our laws are not to be used to make this State a transitory residing place to secure divorces: Dulin v. Dulin, 33 Pa. Superior Ct. 4, 5. Moreover, in our opinion, the libellant could not acquire either a legal residence or an actual domicile in Pennsylvania until the period of her separation from her husband by his consent had ended. During the period from Nov. 20, 1921, to Dec. 12, 1921, under the circumstances of this case, the husband's domicile determined that of his wife, and, hence, the libel filed Nov. 29, 1922, conferred no jurisdiction upon us: Starr v. Starr, 78 Pa. Superior Ct. 579, 581, 582. Besides, all the evidence has failed to satisfy us that the libellant resided in the State with domiciliary intent one whole year previous to the filing of her libel. The 9th, 10th, 11th and 12th exceptions to the master's report are, therefore, sustained and the 1st to the 8th, inclusive, are dismissed.

And now, Feb. 9, 1925, libel dismissed, at the cost of the libellant.

From M. M. Burke, Shenandoah, Pa.