Mason *v.* Mason, Appellant.

Argued April 28, 1931.

Before TREXLER, P. J., KELLER, LINN, GAWTHROP, CUNNINGHAM, BALDRIGE and DREW, JJ.

*Ward Bonsall,* and with him *William K. Johnson,* for appellant.

*Wm. J. Graham,* for appellee.

Opinion by Drew, J., July 8, 1931:

This is an action in divorce by a wife against her husband. The grounds charged in the libel are: (1) cruel and barbarous treatment; (2) indignities to the person. A learned judge of the court below, whose opinion and decision are entitled to respect, entered a decree granting a divorce, from which action the husband appealed. It is our duty to review the testimony and decide the case on its merits: Nacrelli v. Nacrelli, 288 Pa. 1. A divorce will not be granted unless the ground alleged in the libel is clearly established by the evidence: Ulizio v. Ulizio, 96 Pa. Superior Ct. 91.

The parties were married November 9, 1909, in Millvale, Pennsylvania, where they have since resided. They are the parents of two children, Robert and Eleanor, 19 and 17 years of age. The respondent is now 63 and his wife 45 years of age. They lived together, at least in the same house, until January, 1930, when she sent his personal belongings to him at his store, with notice not to return to the house.

The testimony discloses an unhappy married life covering many years. The wife complains that during practically her whole married life her husband showed no affection for her or the children; that he was disagreeable with her and her relatives and by his conduct alienated them from her; that he failed to support his family and that almost the entire expense of the household was paid out of her private income; and that—although his own life was a failure in a material sense—he interfered with her in the management of her own estate, causing unhappy family differences. There is sufficient testimony to support these complaints, and we believe them to be true, but it is not because of any of them that this suit was instituted.

Apparently this testimony was given only as preliminary or introductory to the real cause of complaint—the actual compelling reason why these parties separated after a married life of more than twenty years. She testified that, for several months prior to the separation, he frequently charged her with having committed adultery, threatened to take her life, informed her children that she was immoral, and made known his accusation to members of her family and others.

He denied he charged his wife with adultery, but testified that there is no doubt in his mind that she is guilty of that offense. He said he reproved her for unconventional conduct, but admitted he threatened to "break up the relationship if it took bullets to do it." We are convinced that he not only thought her guilty, as he admits, but time and again, in revolting terms, told her so.

This serious trouble grew out of a trip which the wife made in the winter of 1929. With the consent of her husband, and for the benefit of her health, accompanied by her children, then 18 and 16 years of age, she departed by automobile for Texas. A friend of the family, James A. Ketler, 22 years of age, went along to drive the car. They went to Weslaco, Texas, to a property owned by Mrs. Mason's sister, and lived there from early January to May 25th. The house consisted of two rooms and a sleeping porch, and one room was occupied by Mr. and Mrs. Furnas, tenants of the place. The other room was used by Mrs. Mason and her party as a living room and kitchen, and at night she and her daughter slept there. Her son and Ketler slept on cots on the sleeping porch.

A board partition, not sound proof, separated the two rooms of this small house. There was an opening in the partition for a door, but a door had not been put in place, the opening being partly closed by an Indian blanket hung over it. There was very little

privacy on either side of the partition. Conversation in one room could be heard in the other.

During their stay in Texas, the children went to school. Ketler acted as chauffeur, worked about the place, and took odd jobs in the town when he could get them. The libellant wrote frequently to her husband, and very frankly told him of their living arrangements—how she and her daughter occupied the living room and her son and Ketler slept on the porch. It does not appear he objected to that during the five months they were there.

While in Texas, Mrs. Mason and two of her friends, who were husband and wife, were driven by Ketler into Mexico, where they remained all night at the home of these friends. She wrote respondent fully about that trip, also sent him a postal card from Mexico. He has complained of this trip but there is nothing in the testimony to justify his suspicions.

The family left Texas on May 25th, and on the way home spent a night in Ashland, Kentucky. They could secure but one room in the hotel, and the whole party occupied that room. Mrs. Mason and her daughter occupied the bed, and retired while Ketler and her son were walking about the town. They arose and dressed, in the bath room, before her son or Ketler, who were sleeping on the floor, were awake. With her 16 year old daughter in bed with her, and her 18 year old son in the room, it would seem her husband should be satisfied there was no wrongdoing that night. When she returned she told him of the incident. In his testimony he complained bitterly concerning it. In his bill of particulars he swore that his wife and her party on the return trip from Texas, "at divers and sundry times......again and again occupied one bedroom," but at the hearing he was obliged to admit that he knew of only one such in-

stance—the one referred to about which she had told him.

After Mrs. Mason returned from Texas she and her husband occupied the same bedroom for about two months, until the daughter suggested to her father that he take her room and allow her to go in with her mother. The daughter testified she did this because she noticed each morning that her mother had been crying. She stated she inquired the cause and was told by her mother that her father talked to her at night and was always accusing her of being immoral. She also testified her father told her that "everything wasn't right when they were in Weslaco between Jimmy and mother" and that she told him he was mistaken. The libellant testified that about a week after she returned respondent first accused her of being intimate with Ketler and called her vile and vulgar names. The expressions are low, common and vulgar in the extreme. No self-respecting woman would tolerate them and no decent man, regardless of provocation, would use them. The respondent admits having greviously insulted his wife, yet he denies that he actually accused her of infidelity. Her sister testified that he referred to his wife in similar terms in conversation with her. Mrs. Mason said that his conduct in this respect was constant, from the week after she returned home on June 1, 1929, until she brought her action for divorce and drove him from her house.

The respondent admits that he summoned Ketler's father to his store and told him that his son was intimate with the libellant; that he told libellant's sister the same thing; that he told his children that their mother was immoral; and that he told his employee, Nettie Miller, that his wife and Ketler were too friendly. He admits he threatened to break up the alleged relationship "if it took bullets to do it" and

that he so informed Ketler's father and others. His wife and Ketler's father understood this to mean that he would shoot his wife and Ketler, and as a result she was in constant fear of him. She testified that he kept a gun in the house and would "get up in the night and rave" and that she was in constant fear of her life and for that reason kept her children with her as much as possible.

The respondent took pains to advertise his accusations, even going to the extent of having copies made of depositions of Mr. and Mrs. Furnas, which reflected upon the libellant, and distributing them. This he did not deny. His admitted conduct in this and other respects was vindictive and malicious.

A careful examination of the whole record has convinced us that these accusations were most unjust. There is no substantial testimony to support them. They are based solely on unfair inferences and suspicions.

The respondent insists his belief and suspicions are well-founded, and to prove them relies upon the incidents of the Texas trip already referred to. The only testimony he was able to produce to justify his conduct was a letter written by Mr. Furnas, and depositions of Furnas and his wife. The letter was an answer to one he had written asking for information, and is as follows: "I am sorry to say, but your folks did not conduct themselves properly while here. Not speaking of the children for you have two very nice children, and while they were at school the driver spent all of his time in the room with Mrs. Mason and before they left they engaged in making home brew. Their conduct did not only look bad to us, but to other people here as well. There is a strict law here on such things, so it made it bad for us. We are very sorry this has happened." This letter does not show anything to justify respondent's grave suspicions, and certainly is no excuse for his con-

duct. The same is true of the depositions. They are entirely lacking in substantive proof. They do show a disposition to injure Mrs. Mason, and because of their obvious bias we cannot believe them.

The libellant explained the hostility of Mr. and Mrs. Furnas to her by saying that they were tenants of her sister and were expected to account to her for the produce of the place, which they did not do, and that they thought she was spying upon them. The letter of Mr. Furnas shows a grievance, caused by the making of home brew, which he says looked bad to him and other people. His statement that Ketler and Mrs. Mason spent their time together in the room, when the children were at school, is of no value. It should be expected they would spend much time in the only living room they had. And it is not to be presumed for that reason that they were guilty of criminal conduct.

The other witnesses called by respondent did not support him in the slightest. The sum total of respondent's information did not warrant the suspicions and accusation of adultery, and hence his treatment of his wife was both cruel and malicious. His false accusation, phrased in revolting terms, and frequently repeated over many weeks, was without justification or excuse. He put her in fear of her life. He degraded her before her children, relatives, friends and neighbors. He could hardly have been more cruel and malicious. Under these facts libellant was clearly entitled to a divorce: Krupp v. Krupp, 95 Pa. Superior Ct. 474. As said in that case, "That such a course of conduct on the part of a husband would render the condition of any decent woman of ordinary sensibility and delicacy of feeling intolerable and her life burdensome and justify her in refusing further cohabitation seems to be too clear to require extended discussion."

The decree is affirmed and the appeal dismissed at the cost of appellant.