## Stauffer *v.* Stauffer, Appellant.

Argued November 18, 1943. Before KELLER, P. J., BALDRIGE, STADTFELD, HIRT, KENWORTHEY and RENO, JJ. (RHODES, J., absent).

506

James L. Stern, for appellant.

Joseph L. Fox, with him Reuben Levi, for appellee.

OPINION BY KENWORTHEY, J., March 8, 1944:

The master recommended and the court below granted the husband a divorce on the grounds of indignities and cruelty. The decree will be affirmed on the ground of indignities.

Both parties were in their fifties at the time of the hearings in 1941 and had been married twenty-two years. No children were born of the union; respondent "wanted to know who in the hell would be foolish enough to have a child with a damn fool of a Stauffer" and "didn't see any use for any woman to have a child with a God-damn Stauffer." Their troubles began in 1927 and continued until the separation. Throughout the entire period, respondent referred to libellant as a "son of a bitch," "bastard," "whoremaster" and "piece of white trash." These names were constantly hurled at libellant in the presence of relatives, friends, neighbors and employees. Respondent frequently supplemented her arguments with physical violence; she would throw at libellant anything she could get her hands on; she started with small items such as books, glasses and pocket-books; later she progressed to ice tongs, a fire-shovel and an iron poker. Libellant's injuries on one occasion were serious enough to require medical attention. It does not affirmatively appear libellant's life was actually in danger, but the assaults clearly amounted to indignities. *Presutti v. Presutti,* 146 Pa.

Superior Ct. 41, 21 A. (2d) 427. Respondent repeatedly made false accusations of libellant's immorality with other women. She admitted at the hearings that she accused him of "laying with" four or five specific women before 1939, and incorporated the charges in various letters. She made no attempt to prove the truth of the accusations but claimed they were provoked by libellant; that he boasted to her of his exploits with these women. Compare *Aikens v. Aikens,* 57 Pa. Superior Ct. 424. She neglected the ordinary household duties for the express purpose, as she said in a letter, "to keep [whores] out, for he would be ashamed of [the house]," the inference being that if the house were properly kept he would bring them there. On September 19, 1939, she "put him out" of their house in West Virginia, as she expressed it in a letter to her sister-in-law, and he finally settled in Philadelphia with his married brother, a clergyman.

During the latter part of 1939 and the early part of 1940, libellant wrote a number of affectionate, endearing letters to respondent asking her to live with him in Philadelphia. It is her contention these are persuasive evidence her conduct had not rendered his condition intolerable or life burdensome, relying on *Putt v. Putt,* 118 Pa. Superior Ct. 74, 78, 79, 180 A. 92. But the effect of these letters was no greater than a consummated reconciliation; they were merely factors to be considered in determining whether the indignities, both before and after, were such as to make the marital status intolerable. *Di'Stefano v. Di'Stefano,* 152 Pa. Superior Ct. 115, 31 A. (2d) 357. A reconciliation did take place in the spring of 1940—for one night at the home of libellant's brother—but respondent immediately became so suspicious and vindictive that the divorce might be based solely on what transpired thereafter. She moved to a residence a half a block from libellant's brother's house. The brother was a cripple

and throughout this period his wife was ill, so seriously that her physician refused to allow her to testify at the hearing. From the moment respondent came to Philadelphia, she accused the sister-in-law of "laying with" libellant. She called her a "bitch," "bastard," and "whore"; flaunted these accusations at libellant, incorporated them in a letter, confronted the brother and sister-in-law with them whenever she saw them, and blandly repeated them to neighbors. She testified at the hearings that she had made the accusations but that they were true. Yet the only attempt at proof consisted of her uncorroborated statement describing two isolated acts of familiarity and the fact that the brother appears to have been present in the house when they are alleged to have occurred raises a serious doubt as to whether they ever did take place. She shouted at libellant on the street, "Your brother's wife is nothing but a damned whore. You are living with her," and told the family in the brother's house that the sister-in-law was no good, "that she was laying with libellant." When ever she saw libellant on the street, she would curse at and accuse him; on several occasions she threatened to have the sister-in-law arrested for alienation of affections. The brother, who, as a member of the clergy, was deeply humiliated, fully corroborated all of libellant's testimony on this phase of the case; he testified that respondent's conduct was so obnoxious he was twice forced to call the police, and once to consult an attorney. The attorney also testified that respondent accused libellant of having immoral relations with his sister-in-law and that she had even suggested libellant had had an affair with respondent's daughter by a previous marriage. When libellant was at the Naval Hospital in the summer of 1940, she provoked a quarrel while visiting him, shouting and causing a disturbance. She interfered with his employment by taunting telephone calls, and for a period of time had his mail, as

well as his brother's, misdirected to Washington.

Respondent was the only one who asserted the truth of her accusations. Everyone else denied them. They border on the fantastic. We are reluctant to sever the bonds of matrimony of parties tied together as long as these but the testimony justifies no other action.

Decree affirmed on the ground of indignities, costs to be paid by appellant.