Duhme *v.* Duhme, Appellant.

Argued November 13, 1950. Before HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ. (RHODES, P. J. and GUNTHER, J., absent).

*R. L. Ceisler,* with him *John J. Moschetta* and *Ceisler & Rogers,* for appellant.

*H. Russell Stahlman,* for appellee.

OPINION BY ROSS, J., January 12, 1951:

In this contested divorce case, the respondent wife has appealed from a decree of absolute divorce granted her husband on the ground of indignities. The case was argued before a master, who recommended the granting of the divorce, respondent's exceptions to the master's report were dismissed by the Court of Common Pleas of Washington County, and a decree of divorce was entered.

The parties were married in Charleroi on November 21, 1927, and resided together at various addresses there until August 1942, when libellant left the marital abode. Both parties are German-born, their first meeting having occurred in Hamburg, Germany, as libellant was about to embark for the United States. After coming to this country, he advanced money for respondent's passage here. Several years after the marriage, difficulties developed and relations became more strained with the years, culminating in the separation. Shortly thereafter, respondent obtained a support order against the libellant and he conveyed his interest in their home (which they held as tenants by the entireties) to her. One daughter, now a young married woman, was born to the couple. She appeared at the first hearing as a witness for respondent but did not testify.

Libellant charged that although he was a steel worker and required good food, his wife cooked only "every two or three days", reheating the same food for his meals in the meantime, and that the food became unfit for consumption, as a result of which his health was affected; that the lunch which she packed for him was

of the same quality, the coffee often being "three days old" and the kettle unclean; that when he worked on the night shift at the mill he was unable to sleep during the daytime because respondent had the radio blaring very loudly, and when he removed the tubes from it, she pounded on the piano, and that "that happened all the time"; that "the first year till the last" he "gave her all the pay I made . . . my whole pay check . . . around $100", out of which she would allow him fifty cents when he went out occasionally in the evening; that he then discontinued doing so and instead gave her $25 for food every pay period; that his wife called him vile names and "didn't have a friendly word" for him when he came home from work; that on one occasion when he was digging for worms to go fishing, she threatened him with a spading fork; that she threatened to poison him and "get rid of him" and ordered him out of the house during "the last couple of years together"; that he left because he "couldn't stand it any more"—"she made me so nervous". He was corroborated as to various parts of his testimony by neighbors and relatives. Mrs. Sphar, a neighbor, particularly corroborated the incident in the garden relative to the assault with the spading fork. The witness also testified that when respondent called libellant vile names in a "very shrill" tone of voice, "she never cared who heard her", and that when libellant left his home to go to work, respondent and their daughter would stand on the porch and "make faces at him behind his back" "each time he went out". Libellant's uncle, with whom he went to live after his separation from respondent, testified: "Q. What did Mrs. Duhme tell you about her husband? A. She called him a dummy so he would leave her and she told me that she told him 'I want you to go out—I can live without you.' . . . One hundred times she said that . . . to me, and everybody."

Respondent categorically denied all of libellant's accusations—mostly in the form of the single word "No" in response to questions by counsel relative to libellant's charges. It is significant that her daughter, who lived with her from the time of the parties' separation in 1942 until her own marriage in 1948, did not testify in her behalf.

A determination of this appeal depends—as do so many contested divorce cases—upon the credibility of witnesses. Although we are required to consider all the evidence and arrive at our own conclusion thereon (*Nacrelli v. Nacrelli*, 288 Pa. 1, 136 A. 228)—which we have done—the conclusions of the master, who heard the testimony and saw the witnesses, are entitled to careful consideration on appeal and will not be lightly disturbed. *Weber v. Weber*, 156 Pa. Superior Ct. 6, 39 A. 2d 144; *Porter v. Porter*, 161 Pa. Superior Ct. 119, 53 A. 2d 833; *Megoulas v. Megoulas*, 166 Pa. Superior Ct. 510, 72 A. 2d 598. The master has had the advantage of seeing the parties and hearing the testimony; therefore, the rule that his report, although only advisory and not controlling, is to be given full consideration, particularly as regards the credibility of witnesses, is especially applicable where, as here, the testimony is conflicting. *Fullwood v. Fullwood*, 156 Pa. Superior Ct. 409, 40 A. 2d 876; *Graf v. Graf*, 168 Pa. Superior Ct. 66, 76 A. 2d 659.

To support a decree in divorce indignities must consist of a course of conduct which renders the condition of the innocent party intolerable and his or her life burdensome, and they must be shown by evidence from which an inference of settled hate and estrangement may be deduced. *Davidsen v. Davidsen*, 127 Pa. Superior Ct. 138, 191 A. 619; *Monaco v. Monaco*, 160 Pa. Superior Ct. 117, 50 A. 2d 520. The burden of proof is upon libellant, and a divorce will not be granted unless the grounds alleged in the libel are clearly

established by the evidence. *Ulizio v. Ulizio,* 96 Pa. Superior Ct. 91; *Smereski v. Smereski,* 157 Pa. Superior Ct. 377, 43 A. 2d 549.

It is in evidence that respondent accused libellant of infidelity not only directly to him in private, but to other people. Mrs. Sphar testified that two days after she and her family moved next door to the Duhmes, respondent "called me to the fence and told me about her husband running after other women and not providing for she and her daughter". Respondent's own testimony indicates distrust of her husband's fidelity, although the record is bare of any substantiation of it and of any effort on her part to prove the truth of her accusations. (Cf. *Stauffer v. Stauffer,* 154 Pa. Superior Ct. 505, 36 A. 2d 183.) Unfounded accusations of infidelity of a libellant may constitute indignities warranting a decree of divorce. *Kimmel v. Kimmel,* 160 Pa. Superior Ct. 538, 52 A. 2d 245; *Thornton v. Thornton,* 168 Pa. Superior Ct. 391, 77 A. 2d 691. As was stated by President Judge RHODES in *Seder v. Seder,* 164 Pa. Superior Ct. 372, 64 A. 2d 668, at page 374: "Respondent's categorical denials of virtually every incident to which libellant and his witnesses testified is not convincing; nor are we impressed with her testimony that her conduct toward libellant on all occasions was exemplary." In our opinion libellant has met the burden of proof imposed upon him of showing a course of conduct on the part of the respondent which made life burdensome and intolerable for him, and we consider the statement of this Court, speaking through Judge RENO, in *Potter v. Potter,* 168 Pa. Superior Ct. 402, 78 A. 2d 42, at page 405, peculiarly appropriate to the situation presented by this case: "Undoubtedly plaintiff is not entirely without blame for failure to adjust their marital differences. But his conduct was not such as to justify the indignities to which he was subjected, and we find he is

the injured and innocent spouse. Bliss v. Bliss, 167 Pa. Superior Ct. 252, 75 A. 2d 1. The credible evidence establishes a course of conduct on the part of defendant manifesting a hatred of and estrangement from her husband expressed in indignities to his person rendering his condition intolerable and life burdensome, and justifies the granting of a divorce. (citing cases.)"

Decree affirmed.